# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2007-CA-00522-SCT

*KRISTY (STRAIT) LORENZ*

*v.*

*TRAVIS STRAIT*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/22/2007 |
| TRIAL JUDGE: | HON. KENNETH M. BURNS |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CHANCERY COURT |
| ATTORNEY FOR APPELLANT: | J. DOUGLAS FORD |
| ATTORNEY FOR APPELLEE: | J. TYSON GRAHAM |
| NATURE OF THE CASE: | CIVIL - CUSTODY |
| DISPOSITION: | AFFIRMED - 07/31/2008 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., EASLEY AND LAMAR, JJ.**

**EASLEY, JUSTICE, FOR THE COURT:**

¶1.     Kristy and Travis Strait were married in 2003 and divorced in 2005.  Pursuant to the divorce decree, the parties agreed to joint legal custody of their daughter, born in May 2002. Travis was given primary physical custody, subject to Kristy's visitation rights, along with her agreement to assist Travis with child support.

¶2.     On January 27, 2006, Kristy married Aaron Lorenz.  Four days later, Kristy sued Travis to change custody of their three-year-old daughter to her, moving that her circumstances had changed for the better, and therefore, she was entitled to physical custody

of the daughter. The chancery court entered an order on April 11, 2006, denying Kristy's request.

¶3. Eleven days following the ruling, Kristy and Aaron traveled to the Norfolk Naval Base, Virginia, where Travis was stationed, to visit the daughter. Kristy and Aaron testified that, shortly after picking her up, they noticed bite marks and scratches on her arm. Aaron, a sergeant in the United States Air Force and a part-time police officer for the Columbus Police Department, suggested that the bite marks be documented at the emergency room; the two then took the daughter to a local hospital in Norfolk.

¶4. At the hospital, while Aaron was looking for the emergency room, Kristy took the daughter to use the restroom. Kristy testified that while in the restroom her daughter told her that her "pee pee" hurt, and that her daddy had rubbed it with his hand. Kristy reported the conversation to Aaron, who suggested that the emergency room personnel be advised. The hospital staff contacted the police and Child Protective Services with the Department of Human Services for the City of Norfolk. (DHS-Virginia). An emergency order was entered in Virginia giving Kristy temporary custody for ninety days pending further investigation. An advocacy hearing was held shortly thereafter in Virginia but was subsequently dismissed for lack of jurisdiction. During that period, the United States Navy, as a matter of policy, issued a no-contact order requiring Travis have no contact with his daughter until an investigation was conducted. Travis was never arrested, nor was he charged with any type of abuse of his daughter.

¶5.    In late June 2006, pursuant to DHS-Virginia's recommendation, Kristy found a social worker in Mississippi to meet with her daughter.  Teresa Hubbard, a licensed social worker working in private practice in Columbus, met with the daughter on three occasions, at the conclusion of which she reported her findings to DHS-Virginia.  She did not report to the Department of Human Services (DHS) in Mississippi.  During this period, Kristy also took the daughter to a child-advocacy center in Tupelo where multiple child therapists conducted forensic interviews with the daughter.

¶6.    On August 22, 2006, Kristy filed another petition in Lowndes County, Mississippi, to modify the final decree, seeking physical custody, alleging that Travis had allowed his minor child to be sexually and physically abused while in his custody, and requesting an emergency temporary custody order.  The court issued an order the next day awarding temporary custody to Kristy.

¶7.    On October 18, 2006, Kristy and Travis, through their respective attorneys, entered into an Agreed Temporary Custody Order, leaving temporary custody with Kristy until a trial could be held on the merits.[1]  A guardian ad litem (GAL) was appointed thereafter by the court to represent the minor child.

¶8.    Shortly before trial, DHS-Virginia notified Travis that the agency had concluded its investigation and had determined the abuse allegations against him to be unfounded.  At the

---

[1] Except for a two-week period in early August 2006, when the daughter stayed with Travis's mother in Mississippi, the daughter had been in Kristy's custody from late April 2006 until the time of trial on January 27, 2007.

3

time of trial, the Navy's no-contact order was still in effect pending upper-level review; however, the Navy Criminal Investigative Service (NCIS) had closed its investigation with a similar finding to that of DHS-Virginia.

¶9.    During trial, the chancellor heard testimony from the following parties and witnesses in respective order:  Kristy Lorenz, the daughter's mother; Teresa Hubbard, the social worker; Aaron Lorenz, Kristy's current husband; Travis Strait, the daughter's father; Debbie Hickey, Travis's mother; and Nancy Stuart, the GAL.  None of the child therapists from the child-advocacy center in Tupelo testified.

¶10.    Following trial on February 26, 2007, the Chancery Court for Lowndes County entered judgment in this matter.  The court dismissed with prejudice Kristy's petition to modify the final decree, and ordered that custody of the daughter immediately be returned to Travis or, in the event he was still under a no-contact order from the United States Navy, custody was to be placed with Travis's mother.

¶11.    Kristy filed a motion to reconsider, which was overruled by the chancery court. Feeling aggrieved, Kristy seeks review by this Court of the chancellor's decision denying the request for custody modification of the final decree.

## DISCUSSION

¶12.    The standard of review in child custody cases is limited.  This Court will not reverse a chancellor's decision when supported by substantial evidence unless the chancellor either abused his discretion or based the decision on manifest factual or legal error.  ***Settle v.***

4

*Galloway*, 682 So. 2d 1032, 1033 (Miss. 1996). Credibility and weight of the evidence are for the chancellor to conclude. *Chamblee v. Chamblee*, 637 So. 2d 850, 860 (Miss. 1994).

> **I. WHETHER THE CHANCERY COURT WAS MANIFESTLY IN ERROR IN ITS FINDINGS OF FACT SUPPORTING ITS RULING THAT A MATERIAL CHANGE IN CIRCUMSTANCES HAD NOT OCCURRED.**

¶13. In a custody modification proceeding, the moving party must first prove by a preponderance of the evidence that, since the entry of the judgment or decree sought to be modified, there has been a material change in circumstances which adversely affects the welfare of the child. *Pace v. Owens*, 511 So. 2d 489, 490 (Miss. 1987). If such an adverse change is shown, the moving party must then show by like evidence that the best interest of the child requires the change of custody. *Id.* (citing *Tucker v. Tucker*, 453 So. 2d 1294, 1297 (Miss. 1984)); *see Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983) (the polestar consideration in a child custody case is the best interest of the child).

¶14. When allegations of abuse or neglect are made in a custody case, the courts are required by statute to appoint a guardian to represent the interests of the child. *Floyd v. Floyd*, 949 So. 2d 26, 28 (Miss. 2007). The court is not bound by the guardian's recommendations, but the court's findings must include its reasons for rejecting the recommendations. *S.N.C. v. J.H.D.,* 755 So. 2d 1077, 1082 (Miss. 2000) (chancellors must include at least a summary review of the qualifications and recommendations of the guardian ad litem in the court's findings of fact and conclusions of law).

5

¶15. In the case sub judice, Kristy claims that the findings of fact made by the chancellor are manifestly in error. She contends that the chancellor, in his decision to go against the GAL's recommendation that custody be modified to the mother, failed to consider all of the additional facts developed at the hearing that were considered by the GAL: (1) Travis's apparent drinking problems; (2) the bite marks and the cuts and scrapes Kristy noticed on her daughter when she and Aaron picked her up back in April 2006; (3) the daughter's cold sore that Kristy claims Travis left untreated; (4) the fact that the GAL interviewed approximately thirteen individuals associated with both Travis and Kristy before making her recommendation to the court; and (5) other reports by the daughter to Hubbard regarding inappropriate conduct by Travis.

¶16. In any case where a GAL is appointed to represent a child, the chancellor's role as fact-finder requires the evidence presented by the GAL, as well as all other relevant evidence, to be considered and given such weight as the chancellor determines it deserves. *S.N.C.,* 755 So. 2d at 1082. Thus, the question to be answered by this Court is not, as Kristy suggests, whether the chancellor ignored the GAL's recommendation; but rather, whether the evidence in the record support the chancellor's decision. *Yates v. Yates,* 284 So. 2d 46, 47 (Miss. 1973). Here, we find that it does.

¶17. The overriding issue put before the chancellor was whether Travis had sexually abused his daughter. This was a question of fact for the chancellor to decide. *Doe v. Doe*, 644 So. 2d 1199, 1207 (Miss. 1994). In so doing, the chancellor heard conflicting testimony from the two parties and their witnesses.

6

¶18. Kristy testified first and restated what her daughter had told her at the hospital in Virginia. Kristy's husband Aaron testified next and reaffirmed what Kristy told him the daughter had told her. Following Aaron was Hubbard, the social worker, tendered by Kristy as a fact witness based on three counseling sessions she had with the daughter.

¶19. Hubbard told the court she had a master's degree in social work, with eight years of experience. She began counseling with the daughter in late June 2006. During these sessions, the daughter mentioned instances of Travis and his girlfriend taking showers together, included an instance, which Hubbard believed the daughter was trying to convey, when the daughter, Travis, his girlfriend, and the girlfriend's two-year-old daughter all had taken a shower together. Hubbard said the daughter indicated instances of Travis having inappropriately touched her, which included, with graphic detail, an instance regarding Travis's genitalia. Hubbard received this information by use of interview techniques and workbooks designed to get children to tell their own story. Hubbard stated that she has been trained how to use such techniques, but also told the court that she is not a forensic investigator.

¶20. At the conclusion of these sessions, Hubbard sent a report containing her assessments to DHS in Virginia. She did not report her findings to DHS in Mississippi, nor did she produce a copy of that report to the chancery court in this matter.

¶21. Finally, Hubbard testified that, other than the authorities in Virginia, she did not disclose her findings to Kristy or anyone else. She stated to the court, however, that she

assumed the daughter already had told Kristy everything that she had been told by the daughter.

¶22. Travis testified and denied having ever inappropriately touched his daughter. He stated that, aside from basic "potty-training" requirements, there were a couple of periods where his daughter developed diaper rash that required him to apply Desitin to her affected area. Travis also denied taking showers with his daughter, except for one occasion when both, after returning from the beach, entered the shower wearing swim trunks to rinse the sand off.

¶23. This conflicting testimony provided the only evidence for the chancellor to consider in regard to the sexual-abuse claim brought by Kristy. As such, the chancellor was required to make a judgment on the credibility of the witnesses, expert and otherwise, to resolve this question. *Doe*, 644 So. 2d at 1207.

¶24. In his on-the-record findings, the chancellor confirmed his respect for the GAL, adding that his court often used this particular GAL to represent children due to her experience and love for them. The chancellor stated however that he did not agree with the GAL's recommendation in this case because, based on the evidence presented, he did not believe Travis had inappropriately touched his daughter.

¶25. The chancellor reasoned that, based on his experience listening to a number of forensic experts in these types of matters, he felt the questions asked by Hubbard–who was not a forensic expert–were suggestive. The chancellor added that he believed the comments made by the daughter to Hubbard were likely suggested by others. He further added that he

8

believed Kristy's testimony regarding her daughter's indication to her that Travis had inappropriately touched her, was suspect. His reasoning was based partly on the timing of events, which began soon after Kristy was denied her first modification request by the chancery court in April 2006.

¶26. The chancellor also found significant the fact that Hubbard was the only person to whom the daughter mentioned Travis's genitalia. The record supports this finding.

¶27. Kristy's testimony was that Travis had inappropriately touched his daughter with his bare hand. Kristy's sister, who did not testify, told the GAL the same thing.

¶28. Further, and in contradistinction to what Kristy and her sister claimed, the record discloses that Melissa, one of the therapists from Tupelo, told Kristy that the daughter indicated to her that Travis had touched her to apply medication. This is corroborated by the GAL's own testimony that, during her personal interview with the daughter, the daughter indicated that Travis had touched her with his bare hand only to apply medication. This also corroborates what Travis stated in his testimony.

¶29. Also, the GAL stated that her preliminary report was inconclusive as to whether Travis had sexually abused his daughter. She arrived at the basis for her recommendation after having listened to Hubbard's testimony, the same testimony heard by the chancellor. As such, the weight to be accorded to it as evidence was solely for the chancellor, sitting as the trier of fact and ultimate final arbiter, to decide. *Newsom v. Newsom,* 557 So. 2d 511, 515 (Miss. 1990) *(quoting **Pittman v. Gilmore**,* 556 F.2d 1259 (5th Cir. 1977)).

9

¶30. Notably, none of the Mississippi experts who conducted forensic interviews with the daughter testified. Furthermore, the authorities in Virginia who also conducted such interviews determined Kristy's charges to be unfounded.

¶31. Given the chancellor's proximity to the witnesses and ability to view their manner and demeanor, his decision must – as a matter of common sense as well as common law – be given deference by this Court. *See Culbreath v. Johnson*, 427 So. 2d 705, 708 (Miss. 1983) ("The trial court necessarily has an infinitely superior vantage point when compared with that of this Court, which has only a cold record to read").

¶32. As to the additional concerns put forth by the GAL, these being Travis's apparent drinking problems, the bite marks, the cold sore, and the number of interviews conducted by the GAL, Kristy is correct that the chancellor did not address each of these in his findings. However, the chancellor was presented these additional concerns in testimony.

¶33. Under well-settled principles, where the chancellor makes no specific findings, this Court is required by sound institutional considerations to proceed on the assumption that the chancellor resolved all such fact issues in favor of the appellee. *Newsom*, 557 So. 2d at 514 (citing *Bryant v. Cameron*, 473 So. 2d 174, 179 (Miss. 1985)). Thus, we are led to the same question just addressed (supra): Does the evidence in the record support the chancellor's decision. *Yates,* 284 So. 2d at 47.

¶34. Travis admitted on the record to occasions of excessive drinking while at parties he attended in the past. He also admitted to having been arrested and charged with driving while intoxicated in Virginia during September 2006 while his daughter was in Kristy's

10

custody in Mississippi. For this charge, he spent five days in jail and was required to attend a month-long outpatient program called SARP, the Navy's Substance Abuse Rehabilitation Program. Travis told the court that he had completed the program and candidly added that he had chosen to continue with counseling.

¶35. Travis further testified that his daughter, while in his care, had experienced normal cuts and abrasions, including bite marks from other children which occurred during play at her day care center. He also acknowledged that she had developed a cold sore around Christmas 2005, which he treated with Carmex. However, the sore had not yet healed before her visitation period with Kristy began the following January. Notably, Kristy testified that she also treated the sore with Carmex until it eventually healed.

¶36. These were isolated incidents, apart from the overriding issue regarding Kristy's allegation of sexual abuse. The record shows that Travis admitted to prior episodes of imprudent over-consumption of alcohol, but his daughter had no exposure to these episodes. It also discloses that Travis was forthright with the court, in that he chose to take responsibility for his reckless behavior and took further steps to see to it that it does not happen again. Concerning the bite marks, the daughter's cold sore, and her cuts and scrapes, the record does not indicate anything other than normal mishaps consequential to being a child. Kristy presented no evidence that showed Travis neglected his daughter's injuries.

¶37. Finally, regarding the GAL's interviews with multiple individuals associated with the two parties, the only one the record indicates as lending any support to Kristy's claim was

11

with Kristy's sister. As noted supra, she told the GAL the same information to which Kristy testified at trial.

¶38. Thus, we cannot say that the chancellor manifestly failed to consider the facts, additional or otherwise, claimed by Kristy in her charge that a material change in the daughter's surrounding circumstances had occurred. The chancellor's decision to deny Kristy's petition to modify the final custody decree is without error.

## II. WHETHER THE CHANCERY COURT ERRED IN AWARDING TEMPORARY CUSTODY TO THE PATERNAL GRANDMOTHER IN THE EVENT THE NO-CONTACT ORDER HAD NOT BEEN LIFTED.

¶39. As part of the chancery court's decree denying Kristy's petition to modify, the chancellor ordered the immediate return of the daughter to the custody of Travis. The order also included a provision that in the event the Navy's no-contact order had not been lifted, the daughter's custody was to be placed with Travis's mother.

¶40. Kristy argues that this ruling was error. She avers that no proof was submitted at the hearing which would tend to show that she had abandoned the child, was unfit to have custody, or had engaged in conduct so immoral as to be detrimental to the child.

¶41. Grandparents have no legal right of custody of a grandchild, as against a natural parent. *Carter v. Taylor*, 611 So. 2d 874, 876 (Miss. 1992). Thus, in every custody case between a grandparent and a natural parent, there exists a legal presumption in favor of the natural parent. *Id.* This presumption, however, may be rebutted upon a clear showing that the parent (1) has abandoned the child, or (2) the conduct of the parent is so immoral as to be detrimental to the child, or (3) the parent is unfit mentally or otherwise to have custody

12

the child. ***McKee v. Flynt***, 630 So. 2d 44, 47 (Miss. 1993). Absent clear proof of one of the above circumstances, the natural parent is entitled to custody of his or her child. ***Id.***

¶42. Kristy is correct; the chancellor did not make a specific finding that Kristy was either unfit or had engaged in immoral conduct detrimental to the daughter's welfare. Rather, the chancellor found only that Kristy had failed to meet her burden of preponderant proof required for the modification request. This conclusion was grounded on the chancellor's reasoned belief that Kristy's sexual-abuse claim was false and based on motive. Termination of her parental rights would require a further finding based on proof adduced by clear and convincing evidence that Kristy did engage in such detrimental conduct. The chancellor's finding does not reach this far.

¶43. However, the chancellor's order does not terminate her parental rights, nor does it appear to alter the status quo of the final divorce decree. Kristy's rights as the non-custodial parent, such as her visitation rights, have not been changed.

¶44. At the time the chancellor entered his judgment, the Navy's no-contact order had not been lifted. Although NCIS apparently had determined the abuse charges against Travis to be unfounded, Travis's case was still awaiting upper-level review. There is no indication in the record when the Navy would act, only that it could do so at any time. Furthermore, the no-contact order was implemented as a result of Kristy's allegations, which the court determined to be false.

¶45. According to the record, when the Navy issued its order subsequent to Kristy's allegation, Travis's mother stood in for Travis and took care of the daughter for a short

13

period of time before Kristy was given temporary custody. The record also shows that, soon after Travis and Kristy divorced, Travis's mother cared for the daughter while Travis was deployed at sea.

¶46. Placing the daughter in the custody of Travis's mother until the Navy's no-contact order was lifted was a sensible resolution concurrent with Travis's custodial rights. We find that the chancellor's decision was not an abuse of discretion.

## CONCLUSION

¶47. For the foregoing reasons, the judgment of the Lowndes County Chancery Court is affirmed.

¶48. **AFFIRMED**.

**SMITH, C.J., WALLER AND DIAZ, P.JJ., CARLSON, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. LAMAR, J., CONCURS IN PART AND IN RESULT.**