MAXWELL, J.,
 

 for the Court:
 

 ¶ 1. Sarah Davis appeals the Harrison County Chancery Court’s award of physical custody of her six-year-old daughter, Amy Stevens, to the child’s father, Jason Stevens.
 
 [1]
 
 She contests several aspects of the chancellor’s Albright
 
 [2]
 
 analysis, includ
 
 *945
 
 ing the determination Davis deliberately made false accusations of sexual abuse against Stevens. Finding no manifest error in the chancellor’s judgment, we affirm.
 

 FACTS
 

 ¶ 2. Davis and Stevens dated for several years but never married. The two had one child together but separated when the child, Amy, was approximately ten months old. Soon after the separation, Davis filed a paternity suit against Stevens. Stevens admitted paternity but counterclaimed for legal and physical custody of Amy. The chancellor awarded primary physical custody to Stevens, with the parties having joint legal custody. The chancellor granted visitation to Davis and ordered her to pay child support based on the child-support guidelines. On appeal, Davis challenges the chancellor’s
 
 Albright
 
 findings.
 

 STANDARD OF REVIEW
 

 ¶ 3. “Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record.”
 
 Henderson v. Henderson,
 
 757 So.2d 285, 289 (¶ 19) (Miss.2000). We will not disturb a chancellor’s factual findings unless the chancellor’s decision was manifestly wrong or clearly erroneous, or the chancellor applied an improper legal standard.
 
 Wallace v. Wallace,
 
 12 So.3d 572, 575 (¶ 12) (Miss. Ct.App.2009). We do not substitute our “judgment for that of the chancellor, even if [we disagree] with the findings of fact and would arrive at a different conclusion.”
 
 Coggin v. Coggin,
 
 887 So.2d 772, 774 (¶ 3) (Miss.Ct.App.2003). When reviewing a chancellor’s interpretation and application of the law, our standard of review is de novo.
 
 Tucker v. Prisock,
 
 791 So.2d 190, 192 (¶ 10) (Miss.2001).
 

 DISCUSSION
 

 I. Chancellor’s
 
 Albright
 
 Findings
 

 ¶ 4. “In all cases involving child custody ... the polestar consideration is the best interest and welfare of the child.”
 
 D.M. v. D.R.,
 
 62 So.3d 920, 923 (¶ 11) (Miss.2011). The
 
 Albright
 
 factors are a guide for chancellors in weighing the facts to determine the child’s best interest.
 
 Lee v. Lee,
 
 798 So.2d 1284, 1288 (¶ 15) (Miss. 2001) (citing
 
 Albright,
 
 437 So.2d at 1005). An
 
 Albright
 
 analysis is not, by any means, a mathematical equation.
 
 Id.
 
 And the factors are not meant to be weighed equally in every case.
 
 Divers v. Divers,
 
 856 So.2d 370, 376 (¶ 27) (Miss.Ct.App.2003). In some cases, one or two factors may weigh more heavily and control the custody determination.
 
 Id.
 
 The supreme court has held that “[a]ll the
 
 [Albright]
 
 factors are important, but the chancellor has the ultimate discretion to weigh the evidence the way he sees fit.”
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1013-14 (¶ 36) (Miss.2003).
 

 ¶ 5. The
 
 Albright
 
 factors include: (1) the child’s age, health, and sex; (2) which parent had the continuity of care before the separation; (3) parenting skills and the willingness and capacity to provide the primary child care; (4) each parent’s employment and its responsibilities; (5) each parent’s physical and mental health and age; (6) the emotional ties between the child and each parent; (7) each parent’s moral fitness; (8) the child’s home, school, and community record; (9) the child’s preference, if the child is of sufficient age to express a preference by law; (10) the stability of the home environment; and (11) any other equitable factor relevant to the parent-child relationship.
 
 Al-bright,
 
 437 So.2d at 1005.
 

 
 *946
 
 ¶ 6. Here, the chancellor made findings of fact and conclusions of law on each
 
 Albright
 
 factor, finding four of the factors favored Stevens, three favored Davis, and two favored neither party. The chancellor observed the demeanor of both Davis and Stevens as well as Amy’s demeanor with each of her parents. Considering the totality of the circumstances, the chancellor held Stevens should be awarded primary physical custody of Amy.
 

 (1)Age, Health, and Sex of the Child
 

 ¶ 7. Finding this factor favored Stevens, the chancellor focused in part on the fact that since a young age Amy has suffered from allergies and other respiratory ailments. He found these health issues were “caused by her exposure to second hand smoke of primarily her mother and[,] now, also her step-father.” The chancellor also addressed Amy’s “repeated vaginal infections brought on by bubble baths,” which he determined Amy “apparently has continued to be given [by Davis] even though physicians have advised against them.” Amy has also suffered from acid reflux and constipation. The chancellor noted Stevens’s testimony that these symptoms subside when she is provided a healthy diet while in his care.
 

 (2)Continuity of Care
 

 ¶ 8. The chancellor found this factor favored Davis, pointing out that Davis has cared for Amy “the vast majority of the time” since the parties’ relationship ended when Amy was about ten months old. Since that time, Stevens’s visitation has been “sporadic at best” until recently when court-ordered visitation has occurred on a regular basis.
 

 (3)Parenting Skills/Willingness and Capacity to Provide Primary Care
 

 ¶ 9. Concluding this factor favored Stevens, the chancellor emphasized that Davis has taken Amy “to far too many doctors and other health care specialists for non-issues and has failed to care for the real medical and psychological needs of the child.” The chancellor again emphasized the negative impact of Davis’s cigarette smoking around Amy, and that Stevens’s care “dramatically improves” the child’s health.
 

 (⅛) Employment and Employment Responsibilities
 

 ¶ 10. The chancellor found this factor favored Davis in part because Stevens’s income is “sporadic and his work is usually out of town,” although Stevens is home each night. Davis works part time at her husband’s family electrical business. Stevens has been paying $300 per month in child support.
 

 (5) Physical and Mental Health and Age of the Parents
 

 ¶ 11. The chancellor found this factor slightly favored Stevens. He noted Stevens does not smoke and is in good health. The chancellor also pointed out that Stevens’s spouse, until recently, was a smoker. The chancellor found Davis has smoked cigarettes since Amy was born, despite being advised that quitting this habit would greatly improve her daughter’s health. The chancellor also observed that Davis’s husband smokes cigarettes. Davis suffers from hyperlipidemia and hypertension requiring her to take medication. Further, the chancellor noted Davis’s “tendency towards anorexia,” and that Davis had been diagnosed with “anxiety disorder and mixed personality disorder with dependent features.”
 

 (6) Emotional Ties of Parent and Child
 

 ¶ 12. The chancellor found this factor favored Stevens but that both parents have a bond with the child. The chancellor emphasized that Davis had denied Stevens reasonable visitation with Amy until ordered by the court. The chancellor
 
 *947
 
 concluded Davis had “wrongfully” and “deliberately” accused Stevens of sexually abusing their child. As a result, [extensive investigations and testing of [Amy] were required costing thousands of dollars of public funds.” Amy “was separated from both parents and exposed to further questioning by experts, as well as being wrongfully denied a relationship with her father.” The chancellor found the investigation “was injurious to [Amy],” and that she “will probably require years of therapy to recover from the experience.” The chancellor commented that the evidence suggests “the child is carrying the burden of her mother’s psychiatric disabilities and is adversely affected by her mother’s insecurities.” The chancellor found that despite Davis’s actions, Stevens has developed a “very strong bond” with his daughter since the court-ordered visitation.
 

 (7)Moral Fitness
 

 ¶ 13. Again noting Davis’s false accusations of sexual abuse which were “drawn out over an extended period of time,” the chancellor found this factor favored Stevens.
 

 (8)Home, School, and Community Record of the Child
 

 ¶ 14. The chancellor found this factor favored neither party, acknowledging that Amy “is a very bright child who has not yet attended school.”
 

 (9)Preference of the Child
 

 ¶ 15. The chancellor found this factor inapplicable due to Amy’s young age.
 

 (10)Stability of Home Environment
 

 ¶ 16. The chancellor found this factor favored Davis in part because she “has a longer history of both marriage and a home.”
 

 (11)Other Relevant Factors
 

 ¶ 17. Under this factor, the chancellor repeated many of the same observations he had discussed when addressing other factors. The chancellor again emphasized the “false and unsubstantiated claims of sexual abuse against [Stevens].”
 

 II. Davis’s Arguments
 

 ¶ 18. Davis takes issue with several aspects of the chancellor’s judgment. She contends the chancellor erroneously found Davis initiated baseless claims of sexual abuse against Stevens and gave this consideration excessive weight. And she makes several factor-specific challenges to the chancellor’s
 
 Albright
 
 findings. She finally contends the chancellor’s rejection of the guardian ad litem’s recommendation regarding custody was unsupported by adequate findings.
 

 A. Unsubstantiated Allegations of Child Sexual Abuse
 

 ¶ 19. Davis’s primary challenge concerns the chancellor’s conclusion that she deliberately falsely accused Stevens of sexually abusing their child.
 

 ¶ 20. In explaining how the accusations arose, Davis testified she had taken Amy to a licensed social worker, Kathy Roberts, because Amy was having “emotional issues” with visitation. They met with Roberts approximately four weeks after Stevens’s first overnight visitation with Amy. According to Davis, Amy revealed to Roberts “that she was being abused at her father’s house.” Davis claimed Amy had never mentioned the alleged abuse to her before this interview. When the chancellor questioned Davis as to what the child had reported, Davis testified:
 

 Davis: [Amy] said it was a game, they played the naked butt game. Ms. Roberts was asking her what the game was, and she asked her if she wanted her to show her, and Ms. Roberts said that was okay. And she started taking all of her clothes off in Ms. Kathy
 
 *948
 
 Roberts’ office, and she started pointing to her body parts and saying where they were touching her at. ’
 

 The Court: They being?
 

 Davis: Mr. [Stevens] and Ms. [Stevens] ....
 

 Davis testified she and Roberts had questioned Amy “if she was taking a bath, if she was being wiped, or if someone was, you know, anything, and she said no.” Davis testified that Roberts had reported the incident to the Department of Human Services (DHS), and she “mainly let [Roberts] handle it” from there. Davis claimed Amy “continued to tell [Roberts] that she was being abused.” However, Davis offered no further specifics about the abuse the child had allegedly described.
 

 ¶ 21. The record shows Davis had taken Amy to several physicians to be examined. It is undisputed that no physical evidence corroborated her allegations of sexual abuse. Davis acknowledged that since the DHS investigation, Amy has not mentioned the alleged abuse. And the record shows Davis’s attorney abandoned the abuse allegation at trial:
 

 Defense counsel: I mean, everybody that’s been involved in this case was aware that the child went for a forensic [interview] and it was part of what caused [the abuse allegations] to be unsolved.
 

 The Court: And I think that in our last hearing your client withdrew her allegation that such had ever occurred.
 

 Defense Counsel: Absolutely.
 

 In addition to withdrawing the abuse allegation, Davis also testified: “[A]s of right now I don’t feel that [Stevens] will harm our child in the future.” Notably, Davis did not call the social worker, Roberts— the only other person who allegedly heard the child’s allegations of abuse — as a witness.
 

 ¶ 22. Davis insists that even if no abuse occurred, she did not facilitate Roberts’s reporting the allegations to DHS. According to Davis, Roberts formed her own decision to report' the incident based on her interviews with the child. However, Davis decided against calling Roberts as a witness. And from the record, we are unable to find manifest error in the chancellor’s determination that Davis permitted the unfounded allegations of sexual abuse to continue for an extended period of time — approximately two months — subjecting the young child to the trauma of numerous interviews and examinations. There is record support for the chancellor’s finding that Davis perpetuated the allegations of sexual abuse despite having essentially no evidence that any abuse had occurred. As the chancellor reasoned, the invasive investigation — including Amy’s fourteen-day removal to a shelter where she was separated from both parents— undoubtedly has taken an emotional toll on the child. It is beyond dispute that as a result of what the chancellor deemed a groundless DHS complaint, Amy was deprived of visitation with her father for approximately two months.
 

 ¶ 23. The chancellor considered Davis’s allegations of sexual abuse under the “emotional ties of the parent and child” and “moral fitness”
 
 Albright
 
 factors. Davis contends these allegations should not have been viewed under the “emotional ties” factor. However, we find no manifest error in the chancellor determining under this factor that despite the false allegations of abuse, Stevens has maintained a strong bond with his daughter. Indeed, it would be quite difficult for the chancellor to consider Stevens’s relationship with his daughter without mentioning the unsubstantiated abuse allegations.
 

 ¶ 24. Davis compares this case to
 
 Gregory,
 
 where this Court found a mother’s
 
 *949
 
 sexual-abuse allegations did not support a divorce based on habitual cruel and inhuman treatment.
 
 Gregory v. Gregory,
 
 881 So.2d 840, 844 (¶ 17) (Miss.Ct.App.200S) (“What we do not find supported in the record is meaningful evidence that even if the claim [of child sexual abuse] was untrue, that it was a fabrication by [the mother] intended in a cruel and inhuman way to injure her husband.”). But we note that in
 
 Gregory,
 
 our review focused on whether a fault-based divorce was warranted — an entirely different inquiry than an
 
 Albright
 
 analysis of the child’s best interest.
 

 ¶ 25. Here, the chancellor considered the unsubstantiated allegations of sexual abuse from the proper standpoint of the impact on the child. And we find the chancellor remained within his discretion in concluding Davis’s perpetuation of false allegations of sexual abuse weighed heavily against her under certain
 
 Albright
 
 factors — including the “moral fitness” and “catch all” factors. We disagree that the chancellor accorded Davis’s actions undue weight in his overall
 
 Albright
 
 analysis.
 
 See Newsom v. Newsom,
 
 557 So.2d 511, 516 (Miss.1990) (custody was properly modified in part because the mother “subjected the children to numerous unwarranted physical and psychological examinations, not for treatment, but for investigation and interrogation.”).
 

 ¶ 26. Based on our deferential review, we are unable to discern any manifest error in the chancellor’s factual findings regarding the allegations of child molestation.
 

 B. Factor-Specific Challenges
 

 ¶ 27. Davis also alleges a variety of errors relating to specific
 
 Albright
 
 factors.
 

 1. Age, Health, and Sex of the Child
 

 ¶ 28. Amy was several months short of six years old at the time of the hearing. And Davis argues that, based on the child’s young age, the chancellor should have favored her on this factor. Mississippi appellate courts have held a child’s age is “but one factor out of many to be considered in a child custody case.”
 
 Gutierrez v. Bucci,
 
 827 So.2d 27, 81 (¶ 17) (Miss.Ct.App.2002) (quoting
 
 Blevins v. Bardwell,
 
 784 So.2d 166, 173 (¶25) (Miss. 2001)). This factor generally favors the mother when the child is of “tender years.”
 
 Id.
 
 But this rule has been whittled down in recent years and is no longer absolute. In
 
 Copeland v. Copeland,
 
 904 So.2d 1066, 1070 (¶ 7), 1077 (¶¶ 44-46) (Miss.2004), the supreme court upheld a custody award of an approximately two-year-old boy to his father.
 

 ¶ 29. Articulating the current state of the tender-years doctrine, the supreme court explained:
 

 In
 
 Buntyn v. Smallwood,
 
 412 So.2d 236, 238 (Miss.1982), this Court noted that if the mother of a child of tender years is fit, then she should be awarded custody. “A child is no longer of tender years when that child can be equally cared for by persons other than the mother.”
 
 Mercier v. Mercier,
 
 717 So.2d 304, 307 [ (¶ 15)] (Miss.1998). However, this doctrine has been weakened in recent years and now is only a presumption to be considered along with the other
 
 Albright
 
 factors.
 

 Copeland,
 
 904 So.2d at 1075 (¶ 34). And this court has affirmed custody awards to fathers of much younger children.
 
 See Kimbrough v. Kimbrough,
 
 76 So.3d 715, 722-23 (¶¶ 37-38), 725 (¶¶ 65-66) (Miss.Ct. App.2011);
 
 Montgomery v. Montgomery,
 
 20 So.3d 39, 44-46 (¶¶ 22-26, 38) (Miss.Ct. App.2009) (noting diminished weight of tender-years doctrine and affirming chancellor’s award of five-year-old son to father);
 
 Brewer v. Brewer,
 
 919 So.2d 135, 138 (¶¶ 1-2), 140 n. 1 (Miss.Ct.App.2005)
 
 *950
 
 (acknowledging tender-years doctrine but affirming award of four-year-old child to father). Here, the chancellor noted that Amy is “precocious” and “bright,” which is consistent with Amy’s testimony. Even assuming Amy is a child of tender years, the chancellor implicitly determined Amy’s age and gender yielded to considerations of the child’s health. We find no manifest error in the chancellor determining under these facts that Davis not only smoked around her child but subjected her to numerous unwarranted examinations, damaging both Amy’s physical and emotional well being.
 

 ¶ 30. It is also clear from the chancellor’s overall
 
 Albright
 
 analysis that he believed Davis took the child to the doctor excessively — particularly in attempting to corroborate her allegations of sexual abuse — which he weighed against Davis. This finding is supported by substantial evidence. We also note that the chancellor’s finding that the child’s “vaginal infections” were caused by Amy being given bubble baths is supported by the guardian ad litem’s report, which was admitted into evidence. Davis does not contend, nor does any evidence support, that this issue has any connection to the alleged sexual abuse.
 

 ¶ 31. Davis further claims the chancellor erred by weighing her cigarette smoking against her on the
 
 Albright
 
 factor concerning the child’s health. Although Davis testified that she no longer smokes around Amy, she admitted that she still smokes cigarettes and did so during her pregnancy with Amy. Davis does not contest the chancellor’s finding that her smoking has caused Amy’s respiratory problems. Stevens does not smoke. And his wife, though a former smoker, testified at the hearing, she had quit the habit a year earlier. There is no evidence she has ever smoked around Amy. We find no manifest error in the chancellor’s findings regarding the child’s health.
 

 2. Parenting Skills/Willingness and Capacity to Provide Primary Care
 

 ¶ 32. Regarding this factor, Davis argues the chancellor ignored that she is the “only parent who had demonstrated the willingness to provide primary care of [Amy] for most of her entire lifetime.” While we agree the chancellor should have noted under this particular factor Davis’s willingness to provide primary care of the child, the chancellor clearly addressed these concerns under the “continuity of care” factor, which he ultimately found favored Davis.
 

 ¶ 33. Davis cites
 
 Watts v. Watts,
 
 854 So.2d 11, 13-15 (¶¶9, 17) (Miss.Ct.App. 2003), where this court found error on this factor and others, and reversed a custody award. However, the special chancellor in
 
 Watts
 
 also inexplicably found the continuity-of-care factor favored the father despite the mother being the primary physical custodian of the child for an extended period and despite the father’s failure to pay child support since the parties’ separation.
 
 Id.
 
 at 13 (¶ 8). But here, unlike
 
 Watts,
 
 (1) Stevens has regularly paid child support since the parties’ separation,
 
 [3]
 
 and (2) the chancellor’s judgment credited Davis for her period of caring for the child.
 

 3. The Child’s Home, School, and Community Record
 

 ¶ 34. Citing many of these same concerns, Davis contends the chancellor erred
 
 *951
 
 by failing to find this factor favored her. Davis claims the chancellor discounted that Amy has lived with her, and has been happy in her home environment. She adds that Stevens has recently moved to Wiggins, Mississippi, and Amy has no established home and community record there. The chancellor acknowledged, albeit under no particular
 
 Albright
 
 factor, that he was “concerned about [Stevens’s] home and job, in that both are new and may not be adequately established at the present time.” But he found: “Those concerns ... pale in comparison to the six (6) year record of [Davis] in disregarding the physical and emotional health of her child.” We find the chancellor remained within his discretion in weighing these competing concerns in determining the child’s best interest.
 

 4. Other Equitable Factors Relating to the Parent Child Relationship
 

 ¶ 35. Davis claims the chancellor should have addressed the separation of Amy from her half sibling in his consideration of other relevant equitable considerations. There is no dispute that Amy is close to her half sister, who is Davis’s approximately three-year-old daughter from her current marriage. While the chancellor should have specifically addressed this issue, we have held: “There is no rule that requires chancellors to keep siblings together. There is a preference for keeping siblings together, but the paramount concern is the best interest of the child.”
 
 Kimbrough,
 
 76 So.3d at 726 (¶ 64);
 
 see also id.
 
 at (¶¶ 63, 66) (finding no abuse of discretion in an award of custody that required separation of half-siblings). Separation of siblings is “is only one factor” to be considered in making a custody award.
 
 Wells v. Wells,
 
 35 So.3d 1250, 1257 (¶ 28) (Miss.Ct.App.2010). We find this consideration should have been credited to Davis but note the chancellor’s focus on Davis’s continued disregard for Amy’s health and emotional well being was appropriate. We are unable to find manifest error in the chancellor’s overall finding that Stevens was apparently the more favorable alternative to be Amy’s primary custodian.
 

 III. Guardian Ad Litem
 

 ¶ 36. Davis also contends the chancellor rejected the opinions of the guardian ad litem (GAL) and, in so doing, made insufficient findings. She particularly complains that based on the GAL’s report, the chancellor should have given her bond with her daughter considerable weight, especially under the “emotional ties of the parent and child” factor.
 

 ¶ 37. At a preliminary hearing, the court-appointed GAL, Suzanne Baker-Steele, informed the chancellor that the child had expressed a preference to live with her mother. However, Amy acknowledged that her “daddy loves [her].” The GAL also explained that she “was advised [by] the father and the child both that the mother had been encouraging the child to not like her father, to not love her father.” But still, the GAL advised the chancellor, “I’m afraid that if the Court takes custody from the mother, that you are going to damage the child.” The GAL’s report was admitted into evidence without objection, and neither party called her to testify.
 

 ¶ 38. The GAL’s stated purpose for compiling the report was “to ascertain whether [she] thought that the minor child’s interests were best served by visitation with her natural father continuing, based upon the fact that the natural mother of the child had made allegations of sexual abuse against the natural father, after visitation[] had begun.” The GAL ultimately determined that visitation would be in Amy’s best interest and that visitation should “be generous and liberal until such time as [Amy] begins school.”
 

 
 *952
 
 ¶39. The GAL reviewed the records from the investigation by DHS and the Center for the Prevention of Child Abuse. She also reviewed the records of, or spoke to, several physicians who had examined Amy. The GAL found: “There is only one person, Ms. Roberts, who has received any information which could be construed as supporting abuse allegations.”
 
 [4]
 
 But the GAL did “not believe that [Amy] has been either physically or sexually abused by either parent or step-parent.” The GAL also noted: “I do think that [Amy] has seen and/or heard inappropriate language or actions. I do not know where[ ] this took place, or when.” The GAL’s report further noted Amy’s troubling comments about the “naked butt game,” but the GAL “did not observe that the comments were referring to sexual matters at the time that [Amy] said them, nor could [it be] ascertained] who taught her the words.” However, the GAL expressed her “concerns that [Davis] may have actually encouraged [Amy’s] comments and her behavior, if not taught them to her.”
 

 ¶ 40. The report detailed Stevens’s complaints that he was unable to exercise appropriate visitation with Amy at any time prior to court-ordered visitation. Davis required all visits to occur in her mother’s home and for the visits to be supervised-generally by herself or her mother. The GAL observed that “[a]t no point during my observation and interaction [with Amy] did she exhibit any hesitation in approaching [Stevens], which she did repeatedly[.]”
 

 ¶ 41. Davis contends the chancellor discounted the GAL’s opinions in conducting his
 
 Albright
 
 analysis. Davis highlights the GAL’s finding that Amy “is very attached to her mother emotionally, and does, most certainly, suffer from separation anxiety at the time of separation from her mother.”
 

 ¶ 42. The Mississippi Supreme Court has explained the chancellor’s broad discretion to evaluate and weigh the opinions of a guardian ad litem:
 

 In any case where a GAL is appointed to represent a child, the chancellor’s role as fact-finder requires the evidence presented by the GAL, as well as all other relevant evidence, to be considered and given such weight as the chancellor determines it deserves. Thus, the question to be answered by this Court is not ... whether the chancellor ignored the GAL’s recommendation; but rather, whether the evidence in the record support the chancellor’s decision.
 

 Lorenz v. Strait,
 
 987 So.2d 427, 431 (¶ 16) (Miss.2008) (internal citation omitted). Contrary to Davis’s claims, we find it quite apparent that the chancellor considered the GAL’s opinions and indeed incorporated several of her findings and recommendations into his judgment. However, the chancellor disagreed with the GAL’s belief that custody should remain with the mother. The chancellor reasoned:
 

 The Court must ... consider ... the recommendation of the Guardian ad Li-tem that, in spite of all the facts in this case, [Amy’s] bond with her mother is so strong that separation from her mother could possibly do more harm than good. However, more recently the child and her father have developed a very strong bond which in this Court’s opinion is greater than the bond with her mother[.]
 

 The chancellor obviously considered the GAL’s opinion regarding the child’s bond with her mother. Yet he determined after applying the
 
 Albright
 
 factors that Stevens should have physical custody. This case is distinguishable from the case Davis cites for the notion that the chancellor’s findings
 
 *953
 
 are inadequate,
 
 see In re L.D.M.,
 
 848 So.2d 181, 188 (¶ 5) (Miss.2003), where the youth court did not address the guardian ad litem’s recommendations.
 

 ¶ 43. We are restrained from disturbing a chancellor’s resolution of facts, where his or her findings are supported by substantial evidence. The chancellor remained within his discretion in determining Davis’s perpetuation of false allegations of sexual abuse and her apparent disregard for the overall health and well being of the child — among other behavior harming the child — tipped the balance in favor of Stevens having custody. Based on our deferential review, we decline to substitute our judgment for that of the chancellor.
 

 ¶ 44. We also reject Davis’s related argument that reversal is required because the chancellor did not include in his judgment a “summary of the qualifications” of the guardian ad litem.
 
 See id.
 
 (“[T]he youth court should include in its findings of facts and conclusions of law a summary of the guardian ad litem’s reeom-mendations[J”). We find no authority for reversing a chancellor’s custody award based solely on a failure to include a summary of the GAL’s qualifications, and we decline to do so today. We note that Davis neither objected to the admission of the GAL’s report into evidence, nor did she ever challenge the GAL’s qualifications. And even on appeal Davis does not urge the GAL was unqualified. Quite to the contrary, she claims the chancellor erred in failing to adopt the GAL’s opinions regarding her bond with the child. We find no merit to this issue.
 

 ¶ 45. THE JUDGMENT OF THE HARRISON COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, RUSSELL AND FAIR, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
 

 [1]
 

 . Because this case involves allegations of sexual abuse against the father, we have provided fictitious names for the parties and their child.
 

 [2]
 

 .
 
 See Albright v. Albright,
 
 437 So.2d 1003 (Miss. 1983).
 

 [3]
 

 . We note that Stevens admitted he had been late in making payments for five months in the aftermath of Hurricane Katrina because he "had no way of getting any money for myself, for [Davis], or for the child.” Soon after, Stevens paid the arrearages. Davis confirmed that Stevens was "current in child support” as of the custody hearing.
 

 [4]
 

 . As previously stated in Issue II.A, Davis failed to call Roberts to testify.