# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-00129-COA

BRYAN AVANTS                                                                    APPELLANT

v.

SHAWN HAMILTON                                                                 APPELLEE

DATE OF JUDGMENT:              08/24/2017
TRIAL JUDGE:                  HON. DEBBRA K. HALFORD
COURT FROM WHICH APPEALED:    PIKE COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       EDWIN L. BEAN JR.
ATTORNEY FOR APPELLEE:        JASON E. TATE
NATURE OF THE CASE:           CIVIL - DOMESTIC RELATIONS
DISPOSITION:                  AFFIRMED - 05/07/2019
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

### EN BANC.

### BARNES, C.J., FOR THE COURT:

¶1.     Bryan Avants and Shawn Hamilton had a daughter, Jessica, born in 2010.[1] Hamilton also had a sixteen-year-old son from a previous relationship, Bobby, who lived with the family at Avants's home in Summit, Mississippi. On May 5, 2016, Avants was drawing Jessica a bath and doing laundry. He became annoyed because Bobby was playing video games on his cell phone; so Avants asked him to put the phone down. When Bobby did not comply, Avants went to take the phone from him. In an effort to intervene, Hamilton threw a television remote, hitting Avants, and the couple began arguing and tussling with one another. Although it is unclear whether Jessica witnessed the fight, she was upset and crying.

---

[1] Fictitious names have been used to protect all minors' identities.

Hamilton immediately packed her bags, and she and Bobby left the home. She asked six-year-old Jessica if she wanted to leave as well, but the child opted to remain with Avants after he asked Jessica if she wanted to stay and have milk and cookies. The couple has been separated since that time.

¶2. Hamilton filed a petition for temporary and permanent child custody, to establish paternity, and other relief on May 11, 2016. Avants counter-claimed for custody of Jessica and child support. After a hearing on September 12, 2016, the chancery court awarded the parties temporary joint legal and physical custody of Jessica, with alternating weeks of physical custody. Avants voluntarily agreed to pay temporary child support of $400 per month, and the parties were ordered to share the child's extracurricular activity costs equally.

¶3. A trial was held on January 12, 2017, and July 20, 2017. The chancery court entered a "Final Judgment of Paternity, Custody and Support," adjudicating Avants as Jessica's natural father. After an analysis of the *Albright* factors,[2] the chancery court awarded joint legal custody to both parties and primary physical custody to Hamilton, with Avants being awarded visitation on alternating weekends and holidays. The court ordered Avants to pay monthly child support of $550 and to provide health insurance for the child. Avants filed a motion for reconsideration on September 5, 2017, which the chancellor denied. Finding no reversible error, we affirm.

**DISCUSSION**

¶4. Avants argues that the chancery court erred in awarding primary physical custody to

_____

[2] *Albright v. Albright*, 437 So. 2d 1003 (Miss. 1983).

2

Hamilton. In reviewing a chancery court's award of custody, we will affirm unless the decision was manifestly wrong, clearly erroneous, or the chancery court applied an erroneous legal standard. *Baumbach v. Baumbach*, 242 So. 3d 193, 199 (¶21) (Miss. Ct. App. 2018) (citing *Ethridge v Ethridge*, 226 So. 3d 1261, 1262 (¶5) (Miss. Ct. App. 2017)). However, if the court's decision is not supported by substantial evidence in the record, we will find error. *Id*.

¶5. In *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983), the Mississippi Supreme Court held that "the polestar consideration in child custody cases is the best interest and welfare of the child." In addition to the child's age, the court considers other factors in determining an award of custody:

> [the] health[ ] and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of parents; the home, school[,] and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of [the] home environment and employment of each parent[;] and other factors relevant to the parent-child relationship.

*Id*. Finding several factors favored Hamilton, the court awarded her physical custody of the minor child.[3]

### A. Age of the Child

¶6. The chancery court found that this factor slightly favored Hamilton, noting that although Jessica was "no longer an infant," Hamilton had been the child's primary caregiver

---

[3] We will not address those factors that were found to be neutral and are not disputed by Avants on appeal.

before the couple's separation. Avants argues the court's finding was in error because Jessica was not a child of tender years. We agree. "A child is no longer of tender years when she can be equally cared for by persons other than the mother." *Woodham v. Woodham*, 17 So. 3d 153, 157 (¶9) (Miss. Ct. App. 2009) (citing *Mercier v. Mercier*, 717 So. 2d 304, 307 (¶15) (Miss. 1998)). In *Woodham*, this Court upheld a chancery court's determination that a child of four years old was not a child of tender years and that both parents could take care of the child. *Id*. at 157 (¶10). Here, Jessica was almost seven years old at the time of the trial. There was substantial evidence presented that Avants and Hamilton were equally capable of caring for Jessica. Therefore, we find the chancery court's ruling that this factor favored Hamilton was not supported by the evidence. However, "a child's age is 'but one factor out of many to be considered in a child[-]custody case.'" *Davis v. Stevens*, 85 So. 3d 943, 949 (¶28) (Miss. Ct. App. 2012) (quoting *Gutierrez v. Bucci*, 827 So. 2d 27, 31 (¶17) (Miss. Ct. App. 2002)).

    B.    *Health and Sex of the Child*

¶7.    The chancery court also found that this factor "slightly" favored Hamilton, noting that usually the mother is favored when the child is female. The court also observed that Jessica is in good health, except for her chronic bed wetting, which Hamilton testified had become worse since the separation. Avants claims the court's finding is not supported by the evidence.

¶8.    Hamilton testified that "since [the] separation [Jessica's] been wetting the bed more and more and more" and that Jessica was embarrassed to tell Avants when she wets her

4

pants. We find this evidence sufficient to support the chancellor's finding. Furthermore, Avants admits that he had tried to resolve the bed-wetting issue through counseling for Jessica and that the bed-wetting "could be a maturity or an emotional problem."

¶9. As our Court has held, "these factors are 'not, by any means, a mathematical equation.'" *Tidmore v. Tidmore*, 114 So. 3d 753, 761 (¶23) (Miss. Ct. App. 2013) (quoting *Wilson v. Wilson*, 79 So. 3d 551, 566 (¶63) (Miss. Ct. App. 2012)). We find no error in the chancery court's finding this factor slightly favored Hamilton.

### C. Continuity of Care

¶10. The chancery court noted that while the parties lived together, they shared in Jessica's care. Avants admitted Hamilton had been the primary caregiver prior to separation and had taken care of most of the child's basic needs. Avants attended to the child's routine needs when he was not working away from home. The court reasoned that this factor favored Hamilton.

¶11. Avants, who had worked two-weeks off/two-weeks on in the oilfield industry before the separation, argues he was "punished" because of the time he had spent away from Jessica while working. He notes that on the night of the incident, he had been running Jessica a bath and folding clothes. While the evidence certainly demonstrates that Avants is a loving and attentive father to Jessica, we find there is also substantial evidence to support the court's finding that Hamilton was the primary caregiver prior to the separation and that this factor favored her.

### D. Parenting Skills

¶12.  The chancery court concluded that this factor was neutral, finding "little evidence of disparity in this area." Avants asserts there are facts in the record to support a finding that this factor should have favored him. He cites several items to support his argument, such as: (1) Hamilton's remote-throwing incident; (2) Bobby's generally disrespectful behavior toward both parties (e.g., not responding with "no, ma'am" or "yes, ma'am"); (3) Hamilton's allowing Bobby to dye his hair different colors; (4) Hamilton's failure to insist Bobby get help (tutor) with his schoolwork issues; and (5) Hamilton's introducing the children to her boyfriend, Shane Dykes, soon after the separation.

¶13.  The evidence showed that Bobby did have some problems with his grades in a couple of classes, due to chronic health issues (diabetes and Addison's disease). However, Bobby and Hamilton both testified that he was on a special plan through the school, which would help get him back on track and give him extra time to bring up his grades. Hamilton admitted that she began talking to Dykes a few days after the separation because she had known him for twenty-five years. She said that initially Dykes was just a friend. Bobby testified that Hamilton occasionally brought Dykes over to their house but never spent the night, and the couple never kissed in front of Bobby or Jessica. Regarding the remaining issues asserted, the chancellor heard the evidence and, apparently, did not feel it warranted a finding that Avants had better parenting skills than Hamilton. "[I]t is not our role to substitute our judgment for the chancellor's." *Montgomery v. Montgomery*, 20 So. 3d 39, 42 (¶9) (Miss. Ct. App. 2009).

¶14.  Avants also claims that Bobby's well-being was apparently more important to

6

Hamilton than Jessica's, noting that Hamilton made Bobby leave with her, but not Jessica. We find nothing in the record to support Avants's rationale. Bobby was not Avants's son; it was understandable that he would go with his mother. Furthermore, Hamilton asked Jessica to come with her, but the child chose to stay with Avants that night after he offered her milk and cookies. We find it incredulous to infer that Hamilton's decision not to force Jessica to leave her father that night, but rather let her remain at home, is indicative of her caring for Bobby more than she does Jessica. We find no error in the court's finding that this factor was neutral.

*E.    Willingness and Capacity to Provide Primary Child Care*

¶15.    The chancery court found this factor favored Hamilton, noting she "always managed to balance her career with her family duties, allowing her to provide a steady stream of income while taking care of [Jessica]." The chancellor noted Avants voluntarily left his regular job in order to build a home for the family, but this decision may have "limited his capacity to fulfill his financial responsibilities."

¶16.    Avants argues that he should have been favored because he left his oilfield job to find a local job compatible with Jessica's school schedule; thus, he showed "more of a willingness to provide for [her] primary care." We can find no error in the court's ruling. The record shows that at the time of the trial, Avants had no definite plans for future employment, except to say he was pursuing opportunities. Hamilton, as a charge nurse, was able to schedule her work around Jessica's needs and prior to the separation was the primary caregiver despite her work schedule.

*F.     Employment Responsibilities of the Parent*

¶17.    Before the separation, Avants was routinely gone for two-week periods due to his job. Avants voluntarily left that job and was living off his savings while he built a house; so his schedule became more flexible. He worked a part-time job as a handyman to supplement his income. Hamilton, a nurse, worked twelve-hour shifts (6:45 a.m.–7:15 p.m.) every other weekend and three days during the week. The court noted that while Hamilton's schedule is "unconventional," she is assisted by close family members (her sister and brother) in caring for Jessica. Therefore, the court found this factor to be neutral.

¶18.    Avants argues that this factor should have favored him because his schedule is more compatible with Jessica's and shows his willingness to provide primary child care. He claims that due to Hamilton's work schedule, she is only spending two hours with the child on those days she works late. Avants further speculates that Jessica's staying with her aunt while her mom is at work "cannot be very stable for a child of her age."

¶19.    The record shows that on the days that she works her twelve-hour shift, Hamilton does require assistance from her sister, who runs a licensed daycare, to take care of the child before and after school. Her brother also picks up the children from school. However, there was no evidence that this situation has adversely affected the child. Plus, Hamilton's employment as a nurse gives her financial stability, enabling her to take care of the child's financial needs. Therefore, we find no error in the court's determination that this factor is neutral.

*G.     Emotional Ties of Parent and Child*

¶20. The chancery court determined that this factor was neutral because the child appeared to be "emotionally connected to both parents." Avants asserts that Jessica's decision to stay with him on the night of the separation indicated her strong emotional ties to him. He also reiterates that Hamilton's insistence that Bobby leave with her indicated a preference for Bobby over Jessica and noted that the first two nights she spent with Hamilton after the separation, Jessica called him crying and wanting to come home. Avants also says he had enrolled and paid for Jessica to play baseball, attend vacation bible school, and cheerleading camp. Therefore, he claims the factor should have favored him.

¶21. Hamilton argues that the evidence showed that on the night of the separation, Avants "bribed" Jessica with milk and cookies to get her to stay with him that night. Avants did not dispute this fact. He also admitted that Jessica had not called him crying when she was with her mother "in a long time" and that the child was always glad to see her mother. Finding nothing in the record to demonstrate Jessica had a stronger emotional tie to one parent over the other, we conclude that the court's determination that this factor was neutral was not an abuse of discretion.

### H. Stability of the Home Environment and Employment of Each Parent

¶22. The chancellor found that both households were "relatively stable." He noted that Hamilton had maintained steady employment, medical insurance coverage for Jessica, and has strong family support to help her with child care. Avants, on the other hand, left his well-paying job in the oilfield, depleted his savings to build a home, and his new job, while more flexible, had substantially less pay and fewer benefits. The court also observed that the

9

persons Avants indicated would help him with child care (his mother and father's girlfriend) have a history of mental health issues. Thus, "considering the totality of the circumstances," the chancery court determined this factor favored Hamilton.

¶23. The only findings the chancery court made that are disputed by Avants concern his support network. But Avants merely argues that he could also use Hamilton's sister for child care, as well as a female friend who had a daughter. He also mentions the fact that his home is where Jessica grew up; whereas Hamilton had moved in a "converted warehouse" after the separation without a separate room for Jessica. However, the testimony was that Hamilton's "warehouse" had all the amenities of an apartment, and she recently bought a new home where Jessica would have her own room. We find no error in the court's finding this factor favored Hamilton.

### I.      Other Factors Relevant to the Parent-Child Relationship

¶24. The chancery court noted the sibling bond between Bobby and Jessica and found that "a custodial situation where [Jessica] will primarily reside in one home, instead of two, may give her the security and reassurance that she needs to overcome" her bed-wetting issue. Therefore, the court held that this factor favored Hamilton. Avants does not dispute the court's finding.

### CONCLUSION

¶25. Although the chancery court erred in determining the "age of the child" favored the mother, it is but one factor in determining an award of custody. *See Davis*, 85 So. 3d at 949 (¶28). We find no error in the chancery court's award of primary physical custody to

10

Hamilton and affirm the judgment.

¶26.  **AFFIRMED.**

**CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR. TINDELL, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY McDONALD, LAWRENCE AND McCARTY, JJ.; WESTBROOKS, J., JOINS IN PART.**

**TINDELL, J., SPECIALLY CONCURRING:**

¶27.  Because Avants and Hamilton had joint legal and physical custody of Jessica with seemingly no problems for nearly a year, and since the *Albright* factors were seemingly neutral between the parties,[4] I believe a presumption arose that joint physical custody was in Jessica's best interest.  While I would prefer to reverse the chancellor's award of primary physical custody to Hamilton and to award joint physical custody to both parents, I recognize that under current Mississippi law there is no standard by which such a presumption may arise in contested cases.  Consequently, I feel compelled to write this special concurrence.

¶28.  In today's world, we often hear the term "dead-beat dad."  And while no preference exists as to which parent receives primary physical custody, in most cases primary physical custody goes to the mother.  A 2018 national study analyzed the share of parenting time fathers receive in custody arrangements by state.  *How Much Custody Time Does Dad Get in Your State?*, https://www.custodyxchange.com/maps/dads-custody-time-2018.php (last visited May 7, 2019).  The study "reflect[ed] cases in which both parents want[ed] custody

---

[4] I acknowledge that the chancellor found the *Albright* factors slightly favored Hamilton.  We must keep in mind, however, that the *Albright* analysis is concerned with choosing a favorite between the two options presented rather than with finding complete neutrality between those options.

and no extenuating circumstances—such as criminal convictions or long-distance separation"—existed. *Id.* Mississippi ranked forty-eighth out of all states, with fathers in Mississippi receiving 23% of the custodial time with their children. *Id.* "Maybe it's time to let the old ways die."[5] In this case, we have a father (Avants) who not only voluntarily agreed to pay child support even though he had joint physical custody, but he also quit his higher paying job as an oilfield worker to work a local job to spend as much time as possible with his daughter.

¶29. A number of states aim to give children equal time with both parents when the parents live in the same geographic area and no other extenuating circumstances exist (such as a history of domestic violence or criminality). When the *Albright* factors are neutral between both parents, both parents live in the same area, and there are no extenuating circumstances, a presumption that joint physical custody is in the child's best interest should arise. And when that presumption is not overcome, joint physical custody should be awarded. Mississippi Code Annotated section 93-5-24 (Rev. 2018) provides for an award of joint physical custody. Perhaps the time has come, however, for our appellate courts to set forth the specific factors under which the presumption in favor of joint physical custody arises in contested cases. For these reasons, I specially concur with the majority's opinion.

**McDONALD, LAWRENCE AND McCARTY, JJ., JOIN THIS OPINION. WESTBROOKS, J., JOINS THIS OPINION IN PART.**

---

[5] *See* Bradley Cooper, *Maybe It's Time*, on A Star Is Born (Interscope Records 2018) (music by Dave Cobb and lyrics by Jason Isbell).