CARLTON, J.,
 

 for the Court.
 

 ¶ 1. Elizabeth Gainey appeals the judgment of the Pontotoc County Chancery Court, which dismissed her action to modify the child custody arrangement between Elizabeth and her ex-husband, Donnie Ed-ington. Finding that the chancellor failed to consider the totality of the circumstances in determining whether a material change occurred for the purposes of modifying child custody, we reverse and remand for a new trial with directions for the chancellor to reconsider the issue of modification of child custody.
 
 Powell v. Powell,
 
 976 So.2d 358, 361(¶ 11) (Miss.Ct.App.2008);
 
 see also Riley v. Doerner,
 
 677 So.2d 740, 744 (Miss.1996).
 

 FACTS
 

 ¶ 2. Elizabeth and Donnie divorced in April 2001, with Donnie receiving full custody of the couple’s two girls, Tara, age five, and Mia, age four. The divorce decree did not address Elizabeth’s visitation
 
 *335
 
 rights. Over the next three years, while in Donnie’s custody, the girls suffered significant health problems resulting from an apparent overall continuing neglect of their health and welfare. In these three years subsequent to the divorce, Elizabeth made few visits to see her children. She attributed her lack of significant visitation to her ex-husband’s refusal to allow her visitation in the face of her numerous requests and financial limitations. Meanwhile, during this time period, Donnie brought home two new stepmothers for the girls, enjoyed indulging his interests, while neglecting the health problems and welfare of the girls, resulting in significant health consequences.
 

 ¶ 3. In 2004, Donnie married Christie, with whom he amassed a collection of sex toys. Donnie and Christie also engaged in at least one evening of spouse-swapping ■with another married couple in their own home, while Tara and Mia stayed with their grandparents down the road. Christie gave birth in May 2004 to a child that Donnie and Christie believed to be theirs, but which ultimately proved to be the child of another man. Donnie then had to explain to Tara and Mia that the child that they thought was their sibling was not. Then, Donnie and Christie separated in late 2004 and divorced in early 2005.
 

 ¶ 4. Donnie next married Suzanne in the summer of 2005. Suzanne worked as a sex toy consultant who hosted “Passion Parties” in her own home and the homes of others. For some time, she kept her inventory of sex devices at the family home in boxes. Donnie and Suzanne maintained MySpace and other internet accounts on which they posted pictures, videos, and comments. Some of the material on these pages include a picture of Suzanne in a French maid costume, a movie trailer featuring a naked woman sold into slavery and kept in a cage, a picture of Charles Manson, and a video of Ronald McDonald being shot in the face.
 

 ¶ 5. During Donnie’s marriage to Suzanne, Tara and Mia have experienced significant health problems, reflecting an overall neglect for their health and welfare. Mia has a gait derangement for which she has been to a hospital, but the condition remains uncorrected. Instead of receiving physical therapy by a licensed therapist or other licensed health professional, Mia and Tara participate in a karate class taught by a relative as a sort of physical therapy for Mia, according to Donnie. The dental hygiene of both girls is so poor that they cannot receive orthodontic treatment; the state of degradation of their dental hygiene reflects the results of long-term neglect. Both girls suffered staph infections subsequent to such infection being contracted by Suzanne. Mia has also had an ear infection that caused her to fail a hearing examination at school and eventually necessitated tubes.
 

 ¶ 6. Donnie has also allowed Frank Flo-rez, now convicted of possession of a controlled substance with intent to distribute and possession of cocaine with intent to distribute, to supervise Mia and Tara.
 

 ¶ 7. Elizabeth filed her Petition for the Modification of Custody, Temporary Establishment of Reasonable Visitation, and in the Alternative, Permanent Establishment of Liberal Visitation on September 1, 2004. The chancellor entered a temporary agreed order November 8, 2004. Elizabeth filed a second petition for contempt and modification on July 8, 2005. The chancellor appointed Honorable Sidra P. Winter as guardian ad litem on September 6, 2006.
 

 ¶ 8. After a hearing held on June 20, 2007, and September 4-5, 2007, the chancery court granted Donnie’s motion to dismiss on the basis of no showing of a mate
 
 *336
 
 rial change in circumstances adverse to the children’s best interests. The court entered an opinion and judgment to that effect December 10, 2007. On appeal, Elizabeth argues that the chancellor erred in (1) finding no material change in the circumstances adverse to the children’s best interests, (2) excluding introduction of Donnie’s MySpace account into evidence, and (3) not requiring a report from the guardian ad litem.
 

 DISCUSSION
 

 I. Material Change in Circumstances
 

 ¶ 9. This court has a limited scope of review in challenges to a chancellor’s decision to deny a custody modification.
 
 Creel v. Comacchione,
 
 831 So.2d 1179, 1183(¶14) (Miss.Ct.App.2002). “We can reverse only when a chancellor’s decision is either manifestly wrong or clearly erroneous, or when the chancellor has applied an erroneous legal standard.”
 
 Id.
 

 ¶ 10. In order for a chancellor to modify a child custody decree, the noncustodial parent must prove the following: “(1) that a material change of circumstances has occurred in the custodial home since the most recent custody decree, (2) that the change adversely affects the child, and (3) that modification is in the best interest of the child.”
 
 Powell,
 
 976 So.2d at 361 (¶ 11) (citing
 
 Giannaris v. Giannaris,
 
 960 So.2d 462, 467-68(¶10) (Miss.2007)). This Court has held that “[w]hile numerous factors may go into the initial consideration of a custody award,
 
 see, e.g., Albright v. Albright,
 
 437 So.2d 1003, 1005 (Miss.1983), only parental behavior that poses a clear danger to the child’s mental or emotional health can justify a custody change.”
 
 Lambert v. Lambert,
 
 872 So.2d 679, 684(¶ 22) (Miss.Ct.App.2003) (citing
 
 Morrow v. Morrow,
 
 591 So.2d 829, 833 (Miss.1991)).
 

 ¶ 11. Elizabeth argues that the chancellor failed to view the totality of circumstances in determining whether there had been a material change in circumstances. A change in circumstances “is [a change] in the overall living conditions in which the child is found[,]” and “[t]he ‘totality of the circumstances’ must be considered.”
 
 Tucker v. Tucker,
 
 453 So.2d 1294, 1297 (Miss.1984) (citing
 
 Kavanaugh v. Carraway,
 
 435 So.2d 697, 700 (Miss.1983)).
 

 ¶ 12. Elizabeth produced proof reflecting that Donnie displayed continuing neglect for the welfare and health of the two girls, Tara and Mia, in support of her contention that a material change in circumstances had occurred in Donnie’s home that is adverse to the children’s best interests. Elizabeth also provided evidence that she was denied any meaningful visitation between the time of the entry of her divorce decree in April 2001 when she was finally able to hire counsel to pursue her legal remedies in August 2004. She also claims that Donnie continually thwarted her visitation in the face of an order granting summer and holiday visitation. Elizabeth argues that at least one incident of “spousal swapping” occurred in Donnie’s home between mid-2003 and September 2004, involving Donnie and his second wife Christie. Elizabeth further contends that such parental behavior affected the children’s welfare and home stability.
 

 ¶ 13. As further evidence of home instability, Elizabeth points to the pregnancy and birth of a child by Christie that was not Donnie’s and the cause of Donnie and Christie’s subsequent separation and divorce. Elizabeth also asserts Donnie’s poor judgment as a parent is reflected by his admission that Christie was not a good person to have around the children, and it is also reflected by Christie’s maintenance of a supply of sexual aids and toys in the
 
 *337
 
 home. Elizabeth notes that Donnie married his third wife, Suzanne, within the same year of the divorce from Christie. Elizabeth points out the negative moral influence of Suzanne’s employment as a sex toy consultant who hosts “Passion Parties” in the family home, as well as Suzanne’s extensive time spent on the Internet while at home and her suggestive pictures taken by Donnie that are posted on various web sites.
 

 ¶ 14. In regard to the children’s education, health, and home stability, Elizabeth points to Mia’s diminishing grades and academic progress, and Mia’s gait problem that continues to be inadequately treated. She also asserts that Mia suffers from recurrent and ongoing ear problems that were only treated when brought to light by Elizabeth. She further argues that Tara’s and Mia’s staph infections were contracted subsequent to Suzanne’s staph infection, and she cites the appalling condition of both girls’ teeth. Regarding Donnie’s parental judgment, Elizabeth asserts that he allowed supervision of the girls by a neighbor ultimately imprisoned for selling drugs, and Donnie and Suzanne maintained publicly-aecessible MySpace accounts which contained the following: photos of Charles Manson, a short video of Ronald McDonald being shot in the face, a picture of Suzanne in a French maid costume, and a movie trailer featuring a naked woman sold into slavery and kept in a cage.
 

 ¶ 15. Based upon the foregoing evidence and arguments, Elizabeth contends that the chancellor failed to evaluate the prospective or reasonably foreseeable adverse effect on the children as a result of Donnie’s continuing lack of concern for their welfare. This Court has indicated that under certain circumstances, “adverse effects can be shown where it is reasonably foreseeable that a child will suffer adverse effects because a child’s present custodial environment is clearly detrimental to his or her well-being.”
 
 Gilliland v. Gilliland,
 
 984 So.2d 364, 368(¶ 12) (Miss.Ct.App.2008);
 
 Johnson v. Gray,
 
 859 So.2d 1006, 1014(¶ 39) (Miss.2003) (Reasonably foreseeable adverse effects were due to the mother’s involvement in car accidents, arrests, and fits of rage, all due to being under the influence of alcohol);
 
 Riley,
 
 677 So.2d at 744 (Evidence established that the custodial parent’s home was the site of illegal drug use);
 
 Saveli v. Morrison,
 
 929 So.2d 414, 417(¶ 8) (Miss.Ct.App.2006) (Reasonably foreseeable adverse effects based on evidence that the mother’s new husband screamed at the child on an almost daily basis, used profanity toward her, and admitted that he wanted to hit her repeatedly with paintballs);
 
 Glissen v. Glissen,
 
 910 So.2d 603, 612(¶29) (Miss.Ct.App.2005) (Reasonably foreseeable adverse effects were based on mother’s live-in boyfriend’s abuse of alcohol and drugs, violence, criminal record, as well as the mother’s untruthfulness, questionable judgment, and lack of morals).
 

 ¶ 16. After considering all of the evidence presented by Elizabeth, the chancellor stated that the poor dental hygiene, staph infection, recurrent ear infections, and similar health issues were not the type of substantial changes which would meet the test for modification. Regarding the allegations of Donnie’s sexual activities, the chancellor noted that “it is not the function of the chancery court to police behavior conducted in the privacy of the bedroom unless that behavior can be shown to adversely impact children. There has been no proof of such a nexus or a connection in this case.” However, evidence of such changes, when considered in combination with one another, shows that a pattern of overall disregard for the welfare of the children occurred. Thus, we find that viewing this evidence under the
 
 *338
 
 totality of the circumstances can establish a material change sufficient to warrant a custody modification.
 

 ¶ 17. In
 
 Riley,
 
 677 So.2d at 742, the child’s father filed a motion to modify child custody, alleging that the mother, who had physical custody of the child, was unfit and negligent in caring for their child. The supreme court held that since the mother’s home was the site of behavior adverse to the child’s welfare, and the father was able to provide a good home for the child, “it was within [the chancellor’s] discretion” to transfer custody from the mother to the father, “despite the fact that he could not discern any negative effect on [the child] caused by [the mother’s] home environment.”
 
 Id.
 
 at 744. The court noted:
 

 that where a child living in a custodial environment clearly adverse to the child’s best interest, somehow appears to remain unscarred by his or her surroundings, the chancellor is not precluded from removing the child for placement in a healthier environment. Evidence that the home of the custodial parent is the site of dangerous and illegal behavior, such as drug use, may be sufficient to justify a modification of custody, even without a specific finding that such environment has adversely affected the child’s welfare.
 

 Id.
 

 ¶ 18. In the present case, the evidence in the record reflects a continuing pattern of overall neglect for the health and welfare of the girls. The concerns, taken individually, may not be of such gravity as to warrant substantial change. However, when viewed together, the impact upon the children may indeed be of such gravity as to constitute substantial change under a totality of the circumstances. The combined issues include: the children’s poor grades, untreated gait problem, initially untreated and recurrent ear problems resulting in hearing loss, both girls’ staph infections contracted subsequent Suzanne’s staph infection, and the deplorable condition of the girls’ teeth. All of these reflect a continuing pattern for an overall neglect for the health and welfare of the children. This pattern of neglect reflects poorly upon Donnie’s parenting skills and parental judgment. Further, such an apparent disregard of Tara and Mia’s health care and academics creates an unsafe environment for the children. As the supreme court has expressed: “A child’s resilience and ability to cope with difficult circumstances should not serve to shackle the child to an unhealthy home, especially when a healthier one beckons.”
 
 Riley,
 
 677 So.2d at 744. Thus, we remand this issue to the chancellor to analyze the facts in light of the considerations set forth in
 
 Riley.
 

 II. Exclusion of the MySpace Account into Evidence
 

 ¶ 19. Elizabeth argues that the chancellor erred by excluding the introduction of evidence of Donnie’s MySpace Internet account, which she claims was rife with sexually explicit, highly suggestive, and violent content ranging from bondage and human slavery to sadomasochism. Donnie initially asserts that Elizabeth did not properly preserve her ability to complain of this error on appeal. In support of this position, Donnie asserts that Elizabeth made no offer of proof with respect to preserving for our appellate review the precise material about which she complains was improperly excluded. Donnie also argues that the precise nature of the inference sought to be admitted by Elizabeth was unclear from the context elicited.
 

 ¶ 20. We need not address his assignment of error since we are remanding this case to the chancellor to reconsider whether a material change in circumstances has
 
 *339
 
 occurred after viewing the totality of the circumstances in light of
 
 Riley.
 

 ¶ 21. However, the record reflects no abuse of discretion by the chancellor regarding the exclusion of this evidence.
 
 Harrison v. McMillan,
 
 828 So.2d 756, 765(¶ 27) (Miss.2002) (citation omitted). Employing this standard, this Court “would ordinarily examine the trial court’s ruling for abuse of discretion and then inquire into the [ejffect, if any, this ruling had on a substantial right of the party.”
 
 Perry v. State,
 
 904 So.2d 1122, 1124(¶ 7) (Miss.Ct.App.2004). While excluding the printout of the actual MySpace page, the chancellor allowed Elizabeth to cross-examine Donnie regarding the contents of the MySpace page. Hence, Elizabeth suffered no violation of a substantial right.
 

 III. Failure to Require Testimony from the Guardian Ad Litem
 

 ¶ 22. Elizabeth argues that in basing his finding of no material change in circumstances primarily on the lack of proof of adverse impact on the children, the chancellor thereby erred in ruling that no report from the guardian ad litem was needed on these issues. Mississippi Code Annotated section 93-5-23 (Rev.2006) requires appointment of a guardian ad litem in custody actions where a charge of abuse or neglect arises, as in the present case. In such cases, the guardian ad litem has a responsibility to competently perform her duties and provide recommendations or a written report to the court. Miss.Code Ann. § 43-21-121 (Rev.2004).
 

 ¶ 23. The guardian ad litem had interviewed the children and the parties’ respective families, and during the trial, she waited to deliver her recommendation after the conclusion of all the testimony. Elizabeth asserts that the guardian ad li-tem had identified the negative impact that the custody arrangement had on Tara and Mia. Elizabeth, therefore, contends that the chancellor erred in ruling that no report was needed from the guardian ad litem.
 

 ¶ 24. However, we point out that a guardian ad litem has a duty to “zealously represent the child’s best interest.”
 
 In re D.K.L.,
 
 652 So.2d 184, 188 (Miss.1995). When appointed by the court to investigate, a guardian ad litem “is obligated to investigate the allegations before the court, process the information found, report all material information to the court, and (if requested) make a recommendation.”
 
 S.G. v. D.C.,
 
 13 So.3d 269, 282(¶ 57) (Miss.2009). The guardian ad litem in the instant case, like the guardian ad litem in
 
 S.G.,
 
 failed to provide the court with an objective record of the evidence or make a recommendation as to whether or not a material change in circumstances has occurred. Notwithstanding the guardian ad litem’s responsibility to perform her duties competently, the chancellor remains the ultimate fact finder and is not required to follow the recommendations of the guardian ad litem.
 
 Hensarling v. Hensar-ling,
 
 824 So.2d 583, 587(¶ 10) (Miss.2002). The chancellor must also clearly define the role of the guardian ad litem and the purpose of appointment, i.e., to serve as advis- or to the court or counsel for the children.
 
 S.G.,
 
 13 So.3d at 281(¶48). In this case, although allegations arose as to medical neglect, in addition to other allegations, the guardian ad litem’s role appeared to be ill-defined.
 

 ¶ 25. In the present case, the guardian ad litem interviewed the children and families prior to the trial, but she did not prepare a written report or recommendation. The guardian ad litem also attended the trial. After each witness was questioned, the chancellor asked the guardian ad litem if she had any questions for the witnesses. Each time, the guardian ad
 
 *340
 
 litem declined to ask any questions. Before the court made its ruling, the chancellor asked the guardian ad litem if she wanted to add anything. The guardian ad litem replied that she would “leave it to the court’s discretion as to whether or not there has been a material change in circumstances.” If the guardian ad litem’s intended role was to represent the child zealously, such was not accomplished by a lack of recommendation to the chancellor. The proper function of the guardian ad litem is to investigate, make recommendations to a court, or enter a report.
 
 S.N.C. v. J.R.D., Jr.,
 
 755 So.2d 1077, 1082(¶ 16) (Miss.2000);
 
 In re R.D.,
 
 658 So.2d 1378, 1383 (Miss.1995).
 

 ¶ 26. In
 
 In re D.K.L.,
 
 652 So.2d at 191, the supreme court reversed and remanded the case after observing that the guardian ad litem had failed to interview the family or make recommendations to the court; instead, the guardian ad litem deferred to the parties’ briefs. The court held that the guardian ad litem failed to fully represent the child’s best interest.
 
 Id.
 
 at 191.
 

 ¶ 27. We recognize that no requirement exists for the chancellor to defer to the findings of the guardian ad litem.
 
 S.N.C.,
 
 755 So.2d at 1082(¶ 17). However, a chancellor “shall include at least a summary review of the qualifications and recommendations of the guardian ad litem in the court’s findings of fact and conclusions of law.”
 
 Id.
 
 at (¶ 18). In the event that “a chancellor’s ruling is contrary to the recommendation of a statutorily required guardian ad litem, the reasons for not adopting the guardian ad li-tem’s recommendation shall be stated by the court in the findings of fact and conclusions of law.”
 
 Id.
 
 In this case, based on the foregoing, the guardian ad litem failed to comply with her statutory duties and failed to provide recommendations or a written report to the court. Hence, there were no recommendations for the chancellor to summarize, reject, or consider.
 

 ¶ 28. We reverse the chancellor’s judgment and remand this case for the chancellor to reconsider, based upon the totality of the circumstances, whether a material change in circumstances adverse to the children has occurred when evaluating whether a modification of custody is in the children’s best interests.
 

 ¶ 29. THE JUDGMENT OF THE PONTOTOC COUNTY CHANCERY COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE AP-PELLEE.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR.