# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-00294-COA

**VIVIAN YOUNG**                                                                          **APPELLANT**

**v.**

**JACOB NIBLETT**                                                                          **APPELLEE**

DATE OF JUDGMENT:            02/04/2022
TRIAL JUDGE:                 HON. DAVID SHOEMAKE
COURT FROM WHICH APPEALED:   SMITH COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:      L. WESLEY BROADHEAD
ATTORNEY FOR APPELLEE:       NANCY E. STEEN
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 10/10/2023
MOTION FOR REHEARING FILED:

### BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1. During their thirteen years of marriage, Jacob Niblett and Vivian Niblett Young welcomed two daughters: A.N. and C.N.[1] On June 27, 2017, the couple finalized their divorce in the Smith County Chancery Court. They were awarded joint legal custody of their children. Vivian was awarded sole physical custody, and Jacob was allowed visitation based on a schedule outlined in a property settlement agreement. Later, both parents filed motions for contempt and modification of custody. At the end of trial, the chancellor found that Jacob met his burden of proving a material change in circumstances and awarded him sole physical custody.

---

[1] Initials are used to protect the minors' privacy.

¶2. On appeal, Vivian contends that the chancellor erred by (1) failing to use the appropriate test for a modification of custody, (2) failing to identify the material change in circumstances warranting a modification of physical custody, and (3) failing to state the qualifications and recommendations of the guardian ad litem. Finding no error, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶3. After Jacob and Vivian divorced, Jacob married Ashley Niblett in August 2017. Ashley has two sons from a previous marriage. In January 2019, Vivian married Jonathan Young. Jonathan has two sons from a previous marriage. In the summer of 2019, Vivian and Jonathan bought a home where A.N., C.N., and Jonathan's two sons live together. Vivian and Jonathan later had two additional children.

¶4. On April 12, 2018, Jacob filed a motion for contempt. He made several allegations against Vivian because of her alleged failure to comply with the visitation schedule as outlined in the property settlement agreement. He also alleged that she was getting her friends to harass and stalk him, taking their daughters across state lines without giving him proper notice, and not keeping him apprised of medical matters and school-related events.

¶5. On July 24, 2018, Vivian filed a cross-claim for contempt and modification. She alleged that there had been a material change in circumstances adverse to the best interests of the minor children, warranting a change in the visitation schedule. Specifically, she claimed that the pick-up time for visitation caused A.N. to miss a portion of school; therefore, the visitation time needed to be pushed back. She requested the chancellor to simplify the Christmas visitation schedule. She also alleged that Jacob was not paying his

2

share of the children's expenses.

¶6.     Vivian filed an amended cross-claim for contempt and modification on August 21, 2018. In addition to the allegations included in the original cross-claim, Vivian also alleged that the drop-off time was too close to A.N. and C.N.'s bedtime; therefore, it needed to be changed. She also alleged that Jacob's visitation rights should be suspended or terminated because he was "suffering extreme bouts of manic behavior, narcissistic behavior, illogical thought processes, paranoia, delusions, inability to process information correctly, flight of ideas, extreme mood swings, and lack of empathy for others," and he needed to undergo psychiatric evaluation to determine whether visitation was in the best interest of A.N. and C.N. Lastly, Vivian alleged that Jacob had violated the property settlement agreement on August 19, 2018, by refusing to return the children by 7 p.m. She claimed that instead of returning them that night, Jacob dropped off A.N. at school the next morning and dropped off C.N. with her at their usual exchange location.

¶7.     After August 19, 2018, Vivian withheld visitation from Jacob for over a year. She testified that she was following the instructions of her attorney Bruce Smith,[2] who advised her to suspend visitation until the chancellor entered an order. Despite not being able to see his children, Jacob still called his daughters every night.

---

[2] Bruce Smith is A.N. and C.N.'s grandfather. He is married to Jacob's mother, Wanda Smith. The record reveals that Jacob has a contentious relationship with Bruce and Wanda. Bruce began representing Vivian early on in the case. Jacob filed a motion for disqualification of counsel on September 25, 2018, arguing that he was a potential witness and had personal knowledge of matters at issue in the case. The chancellor denied that motion since it was not alleged at the beginning of the case. On November 27, 2019, Bruce filed a motion to withdraw as counsel. An agreed order substituting L. Wesley Broadhead for Bruce Smith was entered on January 9, 2020.

¶8.    To address the allegations about his mental health, Jacob had two psychological evaluations done by a mental health facility called InTouch Health.  Both evaluations stated that Jacob had acute situational disturbance and acute stress disorder in reaction to being separated from his daughters.

¶9.    A.N. was also having some mental health struggles of her own in reaction to the ongoing feud between her parents.  Wanda Smith, A.N. and C.N.'s paternal grandmother, testified that A.N. "gets more distressed when they fight," and "she's afraid that one of them will somehow . . . keep her from seeing [the other]."  Wanda is a mental health professional and recognized that A.N. was displaying concerning behavior, so she encouraged Vivian to get A.N. and C.N. evaluated.[3]  Vivian took her daughters to a mental health facility called Will's Way in September 2018.   After an intake evaluation, they diagnosed A.N. with adjustment disorder with anxiety and provided some recommendations on how to assist A.N. in treating her disorder.  C.N. was not diagnosed, and they did not have any recommendations for her.  Wanda testified that A.N. also "hit the trigger for depression and low self-esteem and she almost met the criteria for PTSD."  Following the recommendations in A.N.'s report was imperative so that those problems would not materialize.  Wanda testified, however, that

---

[3] Wanda was not qualified to testify as an expert at the trial; however, the chancellor allowed her to give her opinion concerning A.N.'s mental health struggles.  In response to an objection about her not being qualified, the chancellor said,

> I think she's got a relationship with the children. She knows the children. She knows when they go up and down. She knows what happens to them. She's there . . . . I'm not taking it as an expert opinion from a mental health professional . . . . [S]he's not qualified as an expert in this situation[.]  She's just giving her opinion as her grandmother that's had a lot of contact with the child.

she had to constantly stay on Vivian about actually pursuing the recommendations.

¶10. One of the recommendations in the Will's Way report was for A.N. to receive counseling at Region 8 Mental Health Services since it was closer to Vivian's home. Vivian eventually took A.N. to Region 8 to start seeing a counselor twice a month. A.N. initially received counseling at the physical location, but when Vivian and Jonathan moved to Rankin County, she received counseling at her school. However, during the pandemic, A.N. went without counseling from March until June. When she finally received counseling again, it was through phone calls.

¶11. A.N. had several counselors from Region 8. One of the counselors, Katelyn Ronning, remained with her longer than the others. Vivian testified that she felt like Katelyn had established a level of trust with A.N., which allowed A.N. to be very open with her. Katelyn began counseling A.N. during the COVID-19 pandemic. She would speak on the phone with A.N. twice a week. Vivian testified that Katelyn taught A.N. how to process her anger in healthier ways before reacting.

¶12. On July 8, 2019, the chancellor appointed April Taylor Bryant to serve as the guardian ad litem for A.N. and C.N. Shortly after her appointment, April began her investigation and started speaking with several people involved in A.N.'s and C.N.'s lives.

¶13. On September 11, 2019, Jacob filed an emergency motion, asserting that Vivian was violating the chancery court's order by denying him visitation. In response, April began having supervised visitations at her office so that Jacob could see his daughters. The first supervised visit took place on October 19, 2019. This was the first time Jacob was able to

spend time with his daughters since August 2018. April had three more supervised visits in her office on November 2, November 9, and November 23, 2019. A temporary order of visitation was finally entered on December 19, 2019, allowing Jacob to start having 24-hour visitation periods every other weekend and visitation on Christmas Day.

¶14. On April 30, 2020, the guardian ad litem submitted her first report. After reviewing the evidence that was compiled during her investigation, she concluded that Jacob was not a danger to his daughters and he should have visitation. She recommended that they continue to share joint legal custody, with Vivian having physical custody subject to Jacob having visitation. She also addressed several concerns that were brought to her attention during her investigation. She recommended that the visitation schedule be more specific and modified to not conflict with their school schedules. She recommended that Vivian provide Jacob with the proper amount of A.N.'s and C.N.'s medications to last his entire visitation period. She recommended that Vivian keep Jacob informed of all school-related matters. She also recommended that Jacob and Vivian use the "Our Family Wizard App" for all communication.

¶15. The chancellor entered another temporary order on June 23, 2020. The temporary order expanded Jacob's visitation to a seven-day period during the summer and weekend visitation during the upcoming school year.

¶16. While A.N. and C.N were at Jacob and Ashley's home that summer, Ashley testified that one day she observed A.N. playing "mommy and dolls" and was alarmed that A.N. kept telling the doll that she was not going to hurt it: "It kind of struck me when she said that one

6

phrase, I'm not going to hurt you . . . . [T]o me as a mom, as a normal adult, you don't play that and say it's okay, I'm not going to hurt you." Ashley asked her why she would say that to the doll and noticed that A.N. became timid and tried to deflect the question by telling a joke. Jacob and Ashley testified that they noticed deflecting with jokes was a habit A.N. had developed during the time Vivian withheld visitation. They also noticed that she had been drawing pictures and including phrases like "hang in there" and "it's going to be okay."

¶17. Ashley notified Jacob about the doll incident, and they both decided that it was best to get A.N. evaluated. Ashley took A.N. to InTouch Health and Jacob joined them after he got off work. The InTouch report revealed that A.N. was having suicidal ideations and was having several problems in Vivian and Jonathan's home. She expressed how she was being treated poorly by her stepfather and stepbrothers. She revealed that her stepfather said mean things about her father, talked to her like she was stupid, limited the time she could spend with her mother, and spanked her with a belt without her mother's permission. When questioned about where she wanted to live, she said that she wanted to live with her grandmother but also wanted to see her father. The doctors recommended that she return to InTouch to undergo therapy and an evaluation for medication.

¶18. On June 25, 2020, there was a conference with Judge Shoemake regarding A.N.'s InTouch report. A copy of the report was provided to Vivian. Jonathan accompanied Vivian to this conference. When the contents of the report were revealed to Vivian and Jonathan, they were very upset with A.N. They questioned her during the car ride home and accused her of lying about several things she told the doctor. A.N. expressed that she felt like many

7

of her statements were taken out of context.

¶19. Vivian and Jonathan ultimately decided to punish A.N. for a month for the statements she made during her evaluation. A.N. was not allowed to eat dinner, watch television, or play games with the rest of the family. She was not allowed to interact or talk with her stepbrothers. She also was not allowed to use electronics. When the chancellor asked Jonathan to explain why this punishment method was chosen, he testified:

> I became fearful that a little girl could lie as easily as that and disrupt an entire family's life. So I kind of separated myself and the boys until we could really figure out what to do. And it wasn't just . . . if it could affect the custody of my boys, but what if she was to lie on one of my boys and affect their life and they are so young . . . . I decided that it was probably best if we just kind of separated until we could get a handle on what was going on.

Vivian also testified that she wanted A.N. to know how it would feel to not have family, and she thought the punishment "would encourage her to understand the value of family."

¶20. Shortly after this incident, Jacob filed an amended motion requesting a modification of custody due to a material change in circumstances that was adversely affecting A.N. and C.N. Both he and Vivian went on to file several amendments to their claims and cross-claims. The only relevant additions that were included in the amended filings were requests for monetary awards.

¶21. On February 3, 2021, April submitted a supplemental report. Since the time of the last report, she spoke with A.N.'s Region 8 counselor, she made an unannounced visit to Jacob and Ashley's home, and she made an unannounced visit to Vivian and Jonathan's home. She also had several conversations with Wanda. Wanda revealed that she was very concerned about the girls' overall well-being due to the environment at Vivian and Jonathan's home.

She told April about cameras around the home, Jonathan's controlling behavior, the stepbrothers being able to walk around without shirts, and A.N.'s punishment after the InTouch Report was revealed. Following her investigation, April concluded that there had been an adverse material change in circumstances warranting a modification. She recommended that Vivian and Jacob share joint legal custody with Jacob having physical custody and Vivian having liberal visitation. After the supplemental report was released, Vivian and Jonathan cut their communication with Wanda and did not allow her to come to their house anymore.

¶22. During a four-day trial that spanned several months, the chancellor was presented with exhibits and heard testimony from various witnesses who had established relationships with A.N. and C.N. On February 4, 2022, the chancellor released his final judgment, finding that there had been a material change in circumstances that had adversely affected A.N. and C.N. The chancellor ultimately held that it would be in their best interest to live with their father.

¶23. Vivian filed a motion for a new trial or, alternatively, for reconsideration on February 13, 2022. The chancellor denied her motion and ordered that the parties exchange the children on February 22, 2022. Vivian appealed from the chancellor's final judgment on March 28, 2022. On April 28, 2022, she filed a motion to amend the final judgment, but the chancellor dismissed the motion due to lack of jurisdiction.

## STANDARD OF REVIEW

¶24. "When considering the decisions of a chancellor on appeal, this Court has a limited standard of review." *In re Conservatorship of Est. of Loyd*, 868 So. 2d 363, 367 (¶11) (Miss.

Ct. App. 2003) (citing *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000)).  This Court has recognized that "findings of fact made by a chancellor may not be set aside or disturbed upon appeal if they are supported by substantial[] credible evidence." *Carter v. Carter*, 204 So. 3d 747, 756 (¶37) (Miss. 2016).  Reversal is only appropriate if "the chancellor abused [his] discretion, was manifestly wrong or clearly erroneous, or applied an erroneous legal standard." *Leverett v. Leverett*, 309 So. 3d 116, 120 (¶14) (Miss. Ct. App. 2020) (quoting *Gilmer v. Gilmer*, 297 So. 3d 324, 331 (¶13) (Miss. Ct. App. 2020)).  "In matters that are questions of law, this Court employs a de novo standard of review and will only reverse for an erroneous interpretation or application of the law." *Morgan v. West*, 812 So. 2d 987, 990 (¶8) (Miss. 2002).

**DISCUSSION**

**I.      Modification of Custody**

¶25.    "Mississippi utilizes a three-prong test to determine whether custody modification is warranted." *Hammons v. Hammons*, 289 So. 3d 1214, 1218 (¶16) (Miss. Ct. App. 2020). Under the first prong, the moving party must prove that there was a material change in circumstances involving the custodial parent that arose after entry of the first custody order. *Id*. (citing *Sheridan v. Cassidy*, 273 So. 3d 783, 786 (¶10) (Miss. Ct. App. 2018)).  Under the second prong, the moving party must prove that the material change in circumstances has adversely affected the minor child. *Id*. at (¶17).  Under the last prong, the moving party must prove that the modification is in the minor child's best interest.  *Id*. at (¶18).  This determination "is based on an application of the *Albright* factors to the facts of the case." *Id*.

10

at 1219 (¶18) (citing *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983)). "Any change in custody must be predicated on the conduct of the custodial parent that poses a danger to the mental or emotional health of the child." *Hammons*, 289 So. 3d at 1218 (¶17) (quoting *Williams v. Willis*, 49 So. 3d 122, 124 (¶7) (Miss. Ct. App. 2010)).

### A. Identification of the Material Change

¶26. Vivian argues that the chancellor failed to identify a material change in circumstance. We disagree. "The chancellor must consider the totality of the circumstances when determining whether such a material change in circumstances has occurred." *Munday v. McLendon*, 287 So. 3d 303, 310 (¶33) (Miss. Ct. App. 2019) (citing *Creel v. Cornacchione*, 831 So. 2d 1179, 1183 (¶15) (Miss. Ct. App. 2002)). After hearing testimony from several witnesses and reviewing all the evidence, the chancellor thoroughly discussed the material change in circumstance in both the bench opinion and the final judgment that was entered after trial.

¶27. The record reveals that the chancellor gave a summary of the "disturbing" events that it found to constitute a material change in circumstance in A.N. and C.N.'s custodial home: Jonathan was constantly monitoring the family with several cameras that had audio recording capabilities inside and outside their home. A.N. expressed to her counselor that her stepbrothers were mistreating her and C.N. Jonathan and his sons frequently walked around the house without shirts in front of A.N. and C.N. Jonathan called A.N. a problem child and told her that she would have to move out when she turned eighteen. Vivian and Jonathan invaded A.N.'s privacy by reading her journal. Also, Vivian and Jonathan completely cut

11

off A.N. and C.N.'s relationship with their grandmother, whom they were very close to and had known since birth.

¶28. The most troubling event, which the chancellor expressly stated had an impact on A.N., was how Vivian and Jonathan reacted when A.N.'s InTouch report was revealed to them:

> [W]hat has really disturbed me is the way [A.N.] was treated in the home with her stepfather and her two stepbrothers after this report came out from In Touch . . . [T]hey saw the report and were disturbed over it and on the way home strongly questioned a sensitive and worried child, a child full of anxiety. And it really had an impact on [A.N.]. These are things that should not have been discussed with [A.N.] given her sensitive nature. Even without a sensitive nature and anxiety, a normal child should not have been confronted like this and accused of lying and accused of making stuff up. She had opened herself up to an adult counselor and was doing what she thought she should do. She was submitting herself for help from an adult counselor. So when all of this happened, the child was . . . isolated from her family.

She could not play or interact with her siblings. She could not talk to her stepbrothers. She could not watch movies on Friday night with the rest of the family. She could not use electronics and was forced to eat by herself. When A.N.'s mother would occasionally sit with her, she would berate her with comments like, "This is what it feels like to not have a family." This alienation went on for an entire month. Subjecting A.N. to such an extreme form of punishment not only further deteriorated her mental health, but it also ruined the trust she had in her mother, stepfather, and counselors. Substantial credible evidence supports the chancellor's finding that this incident was "badly mishandled" and had an adverse effect on A.N.

¶29. A.N. and C.N. previously had not experienced such a strict environment with Jacob

12

and Vivian, and they certainly were not used to such harsh punishment tactics. Wanda testified, "I felt it was a little bit too big a change all at once instead of gradually going into because they were disciplined totally different than all these years." When testifying specifically about Jonathan, she noted that "whatever he says goes. And that -- that feeling kept getting worse and worse. [H]e's very controlling. And she takes his lead."

¶30. Our caselaw has consistently held that "remarriage itself does not constitute a material change in circumstances that would justify a change of custody." *Dykes v. McMurry*, 938 So. 2d 330, 336 (¶22) (Miss. Ct. App. 2006) (quoting *Robison v. Lanford*, 841 So. 2d 1119, 1123 (¶14) (Miss. 2003)). However, "our precedent indicates that remarriage may constitute a material change only in extreme situations, such as physical or mental abuse by the stepparent." *Kreppner v. Kreppner*, 341 So. 3d 132, 138 (¶33) (Miss. Ct. App. 2022). A.N. told the doctor at InTouch that she "shouldn't be on the face of the earth" since her stepfather came into the picture. Jonathan's behavior was obviously harmful to A.N.'s mental health, and Vivian went along with it by letting him lead. She did not step in to defend her child, who she knew was already struggling mentally. Regarding the punishment after the InTouch report, the chancellor noted, "The mother ought not to have stood for that. The mother ought not to have allowed that and should not have allowed her husband to enforce that kind of punishment on a child." The chancellor also noted in the final judgment that Jonathan "has tried to bend the child to his will rather than trying to address [A.N.'s] concerns." This certainly was not a healthy environment for a child suffering from a mental disorder.

¶31. The record also reveals that the chancellor relied on the findings of the guardian ad

13

litem, who sufficiently identified and explained the material change in circumstances. Since her appointment, April conducted investigations and compiled evidence to assist her in representing A.N. and C.N. She interviewed several individuals that have a relationship with A.N. and C.N., she made unexpected visits to Jacob and Ashley's home and Jonathan and Vivian's home, and she reviewed documents and reports related to the case. Similar to the chancellor, April found that A.N.'s punishment (after her InTouch report was revealed to Vivian and Jonathan) was the key incident that caused an adverse material change. She testified that "[A.N.] was kind of isolated from members of the household. Which when I spoke with [A.N.], it kind of made the whole situation worse for her on how she was feeling."

¶32. Although the incident regarding A.N.'s punishment was discussed at length, the chancellor did not wholly rely on it when determining that a material change in circumstances had occurred. He heard extensive testimony about the environment at Vivian and Jonathan's home and there were several incidents involving A.N. and C.N. that were raised. "While any of these examples alone would arguably be an isolated incident, the totality of the circumstances shows a pattern, one which the chancellor, by virtue of [his] position in the courtroom and hearing all of the evidence presented, is in the best position to determine." *Blagodirova v. Schrock*, 368 So. 3d 1261, 2023 WL 5311041, at *5 (¶27) (Miss. Aug. 10, 2023). In both his bench opinion and final judgment, the chancellor discussed these events and recognized a pattern of concerning conduct by Vivian and Jonathan that was creating an environment adverse to the best interest of A.N. and C.N. This was an informed

14

decision based on the totality of the circumstances, and the chancellor was in the best position to make this determination; thus, we will not disturb his findings.

¶33. After reviewing the record, we conclude that the chancellor identified and specified, with findings of fact supported by the evidence, the material change in circumstances. Therefore, we hold that the chancellor satisfied the first prong of the modification-of-custody test.

### B. Appropriate Test for Modification of Custody

¶34. Vivian contends that the chancellor failed to use the appropriate modification-of-custody test. Because we have fully analyzed the material change in circumstance in the above section, we turn to whether the chancellor applied the second and third prongs of the modification-of-custody test.

¶35. Before modifying custody, the chancellor must find that the moving party has shown a material change in circumstances that has adversely affected the minor child. *Sheridan*, 273 So. 3d at 786 (¶17). Then, the chancellor must find after reweighing the *Albright* factors that the modification of custody is in the minor child's best interest. *Id*. at (¶18); *Butler v. Mozingo*, 287 So. 3d 980, 984 (¶33) (Miss. Ct. App. 2019). After reviewing the record and the chancellor's findings, we conclude that the chancellor properly applied these two prongs.

¶36. The record reflects that the chancellor detailed how the material change in circumstances in Vivian's home had an adverse impact on A.N. individually:

> [I]n my view of the evidence, . . . she's not been healed. She's not been reconciled. She's not cured of the anxiety and the alienation from her family. What she's done is she's learned to cope. And she's learned how to . . . not trust. She surely would never in her life have another session with a counselor

15

at InTouch. And she's closed up to the guardian ad litem who is there trying to help her.

¶37. The chancellor then detailed how both A.N. and C.N. had been adversely affected and how keeping them together in the custody of their father would be in their best interest:

I believe it's important because of the close relationship that [C.N.] and [A.N.] have, they are extremely close, I believe it's -- that these two sisters remain together. I believe in the home that they're living in now the lines have been drawn and they have been controlled and I think they probably see themselves --well, I know they see themselves as a good bit separated from the Young family.

¶38. In the final judgment, the chancellor spent several pages discussing the *Albright* factors: (1) age; (2) the health and sex of the child; (3) the parent who has had the continuity of care prior to separation; (4) the parent with the best parenting skills and who can provide primary childcare; (5) the employment of the parent and responsibilities of that employment; (6) the physical and mental health and age of the parents; (7) the emotional ties of parent and child; (8) the moral fitness of parents; (9) the home, school, and community record of the child; (10) the preference of the child at the age sufficient to express a preference by law; (11) the stability of the home environment and employment of each parent; and (12) other factors relevant to the parent-child relationship. *Albright*, 437 So. 2d at 1005.

¶39. The chancellor gave specific reasons for why he found that a particular factor weighed in favor of a certain parent. Although the chancellor found that several factors were neutral, the chancellor did not find that any of the factors weighed in Vivian's favor. On the other hand, the chancellor found that seven of the factors weighed in favor of Jacob: (1) the parenting skills; (2) the willingness and capacity to provide primary childcare; (3) the

16

employment and responsibilities of the parent; (4) the emotional ties of the parent and child; (5) the home, school, and community record of the children; (6) the stability of the home environment; and (7) the stability of the employment of the parent.

¶40. When reviewing other factors relevant to the parent-child relationship, the chancellor recognized that "[s]tep parents and step siblings have to also be considered as an important part of the relationship between a parent and his or her children." Based on the testimony and evidence revealed at trial, the chancellor concluded:

> Vivian's home is more tense and uncomfortable for the children than Jacob's home. It's apparent that A.N. is afraid of Jonathan and Jonathan is certainly frustrated with her. She is also uncomfortable around Jonathan's children. This situation has been going on for nearly three years and has not yet been resolved.

¶41. The chancellor noted that this is not the case at Jacob and Ashley's home. Ashley is a stay-at-home mom and has much time to devote to A.N. and C.N. They have a good relationship with Ashley and her sons. Jacob and Ashley spend a lot of time with their children doing activities that they enjoy. Also, unlike Vivian and Jonathan, Jacob and Ashley allow A.N. and C.N. to have a relationship with their grandmother, whom they've known their entire lives and are very close with.

¶42. Contrary to Vivian's assertion, the chancellor applied the correct modification-of-custody test. Therefore, we must defer to the chancellor's findings. In his bench opinion, the chancellor stated, "[A]t home with the stepfather, the child[ren] [are] monitored and everything is strict . . . . [T]hese two girls [have] been *impacted* . . . , liv[ing] in constant thought of . . . 'what's going to happen to me if I do such and such.'" (Emphasis added).

17

Although the chancellor did not use the mandated "adverse effect" language, we will not reverse the final judgment for formality's sake alone. A rigid, formalistic approach or strict word requirement "should not thwart the chancellor from transferring custody of a child from one parent to another when, in the chancellor's judgment, the child's welfare would be best served by such transfer." *Stewart v. Stewart*, 309 So. 3d 44, 82 (¶127) (Miss. Ct. App. 2020). "The test we have devised for custody modification need not be applied so rigidly, nor in such a formalistic manner so as to preclude the chancellor from rendering a decision appropriate to the facts of an individual case." *Id*. (internal quotations marks omitted) (quoting *Riley v. Doerner*, 677 So. 2d 740, 745 (Miss. 1996)). Accordingly, we reject Vivian's argument that the chancellor failed to use the appropriate modification-of-custody test.

## II. Qualifications and Recommendations of the Guardian Ad Litem

¶43. Vivian also argues that the chancellor erred by failing to include the qualifications and recommendations of the guardian ad litem in the final judgment. She relies on this Court's mandatory language stating that "a chancellor 'shall include at least a summary review of the qualifications and recommendations of the guardian ad litem in the court's findings of fact and conclusions of law[,]'" in *Gainey v. Edington*, 24 So. 3d 333, 340 (¶33) (Miss. Ct. App. 2009) (quoting *S.N.C. v. J.R.D. Jr.*, 755 So. 2d 1077, 1082 (¶18) (Miss. 2000)).

¶44. The mandatory language quoted above comes from our Supreme Court's holding in *SNC*, in which a guardian ad litem was appointed because the termination of parental rights was at issue. *Id*. at (¶15). In that case, the chancellor departed from the guardian ad litem's

finding that the parent had abandoned the child. *Id*. at 1081 (¶13). On appeal, the appellant asked our Supreme Court to establish a standard obligating chancellors to defer to guardian ad litem recommendations. The Court explained that a guardian ad litem has the duty to be "competent, without interests adverse to the child, and he must be adequately informed as to his duties." *Id*. at (¶16). In addition, the guardian ad litem must investigate and make a recommendation to the court, or otherwise, enter a report. *Id*. In contrast, the Court reiterated that the chancellor is the ultimate finder of fact and determined that a rule requiring the chancellor to defer to the guardian ad litem's recommendation would infringe on the chancellor's authority. *Id*. at (¶17). Thus, the Court affirmed the chancellor's decision to depart from the guardian ad litem's recommendation but held that a chancellor must include a summary review of the guardian ad litem's qualifications. *Id*. at (¶19).

¶45. In *Gainey*, a guardian ad litem was appointed to investigate charges of abuse and neglect. *Id*. at 339 (¶22). The guardian ad litem interviewed the families involved. *Id*. at (¶23). But the guardian ad litem did not provide a written report. *Id*. The guardian ad litem also did not provide "the court with an objective record of the evidence or make a [written] recommendation as to whether or not a material change in circumstances ha[d] occurred." *Id*. at (¶¶24-25). The chancellor found that a report was not necessary. *Id*. at (¶23). To the contrary, this Court explained that a report was necessary so that the chancellor would be able to "summarize, reject, or consider" the "qualifications and recommendations of the guardian ad litem." *Id*. at (¶27).

¶46. This case is distinguishable from *Gainey* and *SNC* because the chancellor had an

objective record of evidence and a recommendation from the guardian ad litem via transcript that he could use to summarize the guardian ad litem's recommendations in his final judgment. The guardian ad litem's recommendations were adopted and discussed in both the bench opinion and the final judgment. As such, Vivian's assertion that the chancellor did not include a summary of the guardian ad litem's recommendations in his final judgment is without merit.

¶47. In regard to the guardian ad litem's qualifications, none were included in the chancellor's final judgment. However, this was not reversible error. *Davis v. Stevens*, 85 So. 3d 943, 953 (¶44) (Miss. Ct. App. 2012) ("We find no authority for reversing a chancellor's custody award based solely on a failure to include a summary of the GAL's qualifications, and we decline to do so today."); *but see Borden v. Borden*, 167 So. 3d 238, 243 (¶13) (Miss. 2014) ("When the guardian ad litem's appointment is mandatory, as in this case, the chancellor must include a summary of the guardian ad litem's *recommendations* in his or her findings of fact and conclusions of law." (emphasis added) (citing *S.N.C.*, 755 So. 2d at 1082)). The chancellor maintains a duty to include a summary of qualifications. But we have found no authority to support the reversing of the chancellor's final judgment to include a summary of qualifications when the chancellor has included a summary of the guardian's recommendations. Therefore, we reject Vivian's argument.

## CONCLUSION

¶48. The decision to change sole physical custody from Vivian to Jacob was well within the chancellor's discretion. The chancellor made sufficient findings in the record and applied

20

the appropriate test to those findings. Also, after appointing the guardian ad litem and finding her competent, the chancellor adopted the guardian ad litem's findings and recommendations and included a summary of her findings in the final judgment. Thus, finding no reversible error, we affirm the chancellor's final judgment to modify child custody.

¶49. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**